Timothy **WADAS**, Appellant,

v.

**DIRECTOR OF REVENUE**, State of Missouri, Respondent.

No. WD 65704.

Missouri Court of Appeals, Western District.

Aug. 1, 2006.

Shane Lee Farrow, Jefferson City, MO, arguing on behalf of appellant.

John Michael Roodhouse, Jefferson City, MO, arguing on behalf of respondent.

Before EDWIN H. SMITH, C.J., P.J., PATRICIA BRECKENRIDGE, and JAMES M. SMART, JR., JJ.

JAMES M. SMART, JR., Judge.

This is an appeal from the revocation of driving privileges under the implied consent law, section 577.020.[1] Timothy Wadas, who is hearing impaired, appeals the trial court's order affirming the revocation of his license by the Director of Revenue. Wadas' main contention is that the interpreter provided by the Lake Ozark Police Department was not certified and licensed by the State; therefore, he contends that under Section 476.753.2,[2] his statements through the interpreter cannot constitute a refusal to submit to a chemical test under section 577.020. We reverse the revocation of Mr. Wadas' driving privileges.

## Procedural and Factual Background

On February 20, 2005, Wadas was pulled over by Jonathan Hasker, Chief of Police for the Lake Ozark Police Department, for not having his headlights displayed. Due to prior interactions with Wadas, Chief Hasker knew he was deaf and mute. Chief Hasker gave rudimentary hand signals to Wadas for him to place his hands on the bed of the truck for a pat down. Chief Hasker noticed an odor of alcohol coming from Wadas, his eyes were bloodshot and he was animated.

Chief Hasker took out a notepad and wrote the word "license?" and showed it to Wadas. Wadas then took the pad and wrote in response, "Not without my attorney." Chief Hasker then wrote on the pad that he was under arrest, put handcuffs on him, and placed him in the back of his patrol car. After another officer arrived to inventory the vehicle for towing, Chief Hasker transported Wadas to the police station. The Chief did not attempt to conduct any field sobriety tests.

Back at the station, Chief Hasker contacted the Osage Beach Department of Public Safety to get a number for someone to interpret between himself and Wadas. He was provided the number of Ms. Judy Nichols and contacted her. Ms. Nichols agreed to come to the police department and interpret.

When Ms. Nichols arrived at the police station, she stated that she was not licensed as an interpreter. However, she stated that she attended years of classes at the Missouri School for the Deaf. Also, she has a deaf son and niece and has communicated with them using sign language for more than forty years. She also used sign language to interpret for the hearing impaired in her church congregation.

---

1. All statutory references are to the Revised Statutes of Missouri, Supp.2005, unless otherwise indicated.

2. Section 476.753.2, discussed more fully *infra,* provides that no statements made by a deaf person may be received in evidence against such deaf person unless the deaf person has been provided an interpreter or other communication aids.

When Ms. Nichols introduced herself to Wadas, his first question for her was whether she was a licensed interpreter. Wadas then put his head down and said, through Ms. Nichols, that his lawyer told him not to talk to anybody but a licensed interpreter. Chief Hasker nevertheless explained each element of the implied consent law to Wadas through the interpretation of Ms. Nichols. After advising him of the law, Chief Hasker asked Wadas to submit to a chemical test to determine his blood alcohol content. Wadas, through Ms. Nichols, again stated he wanted to consult with his attorney. Three unsuccessful attempts were made to contact his attorney. After those contact attempts failed, Chief Hasker again requested Wadas to submit to a chemical test. Wadas continued to state that he wished to communicate with his attorney. This action was treated as a refusal to take the chemical test and his license was revoked.

Wadas petitioned the trial court for review of the revocation of his license on March 4, 2005. At the hearing on May 16, 2005, Wadas did not testify or present any evidence. The trial court affirmed the revocation of Wadas' license. This appeal follows.

## Standard of Review

■ We will sustain the trial court's judgment "unless there is no substantial evidence to support it, unless it is against the weight of the evidence, unless it erroneously declares the law, or unless it erroneously applies the law." *Murphy v. Carron*, 536 S.W.2d 30, 32 (Mo. banc 1976). When the evidence is uncontroverted and the real issue concerns its legal effect, this court need not defer to the trial court's judgment. *Hinnah v. Dir. of Revenue*, 77 S.W.3d 616, 620 (Mo. banc 2002).

## Argument

Wadas' only point on appeal is that the trial court erred in affirming the revocation of his license because the Lake Ozark Police Department used an unlicensed interpreter. He contends that his alleged communications made through an unlicensed interpreter were not admissible against him; thus, there was insufficient evidence to support the revocation. He argues that the term "interpreter" used in section 476.753 can refer only to an interpreter certified and licensed by the State. He states that because the interpreter provided for him was not certified, his statements could not be considered to be a refusal to take a chemical test under the implied consent law, section 577.020.

## Relevant Statutes

Section 476.753 requires a "designated responsible authority" (such as a law enforcement official) to provide aids and services to a deaf person for communication purposes in various official proceedings. It also requires that when a deaf person is involved in official proceedings or is involuntarily detained or arrested, communication aids or services, including possibly sign language interpretation services, must be provided to the deaf person "based on the deaf person's expressed need." If the appropriate aid or service is not provided, any statements made by the deaf person are not admissible in evidence:

2. No answer, statement, admission or other information, written or oral, shall be admissible as evidence in any judicial or administrative proceeding if obtained from a deaf person who is involuntarily detained or arrested before an interpreter or auxiliary aids and services are provided to that deaf person, based on the deaf person's expressed needs. No deaf arrestee, otherwise eligible for release, shall be held in custody

pending arrival of an interpreter or auxiliary aids and services.

Section 476.750, the definition section, states in part:

(1) "Auxiliary aids and services," the device or service that the deaf person feels would best serve him or her which includes, but is not limited to, qualified interpreters, notetakers, transcription services. . . .

. . . .

(5) "Qualified interpreter," an interpreter certified and licensed by the Missouri interpreter certification system or deemed competent by the Missouri commission for the deaf and hard of hearing, who is able to interpret effectively, accurately and impartially both receptively and expressively, using any necessary specialized vocabulary.

Section 476.756 states:

No qualified interpreter shall be appointed or auxiliary aids and services provided, pursuant to section 476.753, unless the designated responsible authority and the deaf person make a preliminary determination that the qualified interpreter or auxiliary aids and services are able to interpret effectively, accurately and impartially the statement of the deaf person and interpret the proceedings effectively, accurately and impartially to the deaf person.

## Discussion

 The contention here is that Wadas' statements should not have been admitted in evidence to show a refusal because the interpreter provided was not certified and licensed by the Missouri interpreter certification system or deemed competent by the Missouri Commission for the Deaf and Hard of Hearing. The issue of whether an interpreter must be so certified and licensed in order to allow admis-

sion of statements under section 476.753 is an issue of first impression. *See Nichols v. Preferred Risk Group*, 44 S.W.3d 886, 892 (Mo.App.2001). "The goal of statutory interpretation is to determine and give effect to the intent of the legislature. To this purpose, the court considers a particular statute together with related statutes which may shed light on its meaning." *State v. White*, 622 S.W.2d 939, 944 (Mo. banc 1981). Sections 476.750 through 476.766 all relate to the interpretation or auxiliary aids and services provided to hearing-impaired persons. Sections 209.285 through 209.339 are also pertinent in that they deal with the certification and licensing of interpreters for the deaf. These sections must all be read together to gather the intent of the legislature. *See id.*

Section 476.750(5) defines a "qualified interpreter" as an interpreter who is certified and licensed by the Missouri interpreter certification system or is deemed competent by the Missouri Commission for the Deaf and Hard of Hearing. Section 476.753.2 states that "[n]o answer, statement, admission or other information . . . shall be admissible as evidence . . . before an interpreter or auxiliary aids are services are provided[.]" This section does not include the word "qualified" before interpreter, but section 476.756 states, in direct reference to section 476.753, that a "qualified interpreter" shall not be appointed until his or her qualifications have been assessed by both the authority and the deaf individual. Reading these sections together, Wadas asks us to infer that an interpreter must satisfy section 476.756 prior to satisfying section 476.753. He argues it is logical to infer that an "interpreter" under section 476.753.2 must be a "qualified interpreter" who is either certified and licensed by the Missouri Interpreter Certification System ("MICS") or is deemed competent by the Missouri Com-

mission for the Deaf and Hard of Hearing ("MCDHH"). If that is true, then under Section 476.753.2 "[n]o answer, statement ... shall be admissible as evidence in any judicial or administrative proceeding if obtained ... before a[ ] ['qualified'] interpreter or auxiliary aids and services are provided[.]"

Sections 209.285 through 209.339 tend to support Wadas' view of the proper interpretation. Section 209.285(13) defines an interpreter as a person who is experienced and "holds a current, valid certification and license to practice interpreting in this state." [3] Under section 209.321.1, a person shall not engage in the practice of interpreting unless properly licensed. This includes rendering interpreting services for government agencies. Section 209.285(20). 5 C.S.R. 100–200.030(1) also provides that any person who "practices" interpreting in the State of Missouri as defined in 209.285 and 209.321, RSMo., must be "certified" by the MICS. For these reasons, we agree with Wadas that the statute in question, 476.753.2, contemplates a "qualified interpreter" within the meaning of Section 476.750(5) when it uses the word "interpreter."

In this case, the Lake Ozark Police Department ceased using pen and paper and sought an interpreter when Wadas arrived at the station. When Ms. Nichols arrived, she made it clear that she was not a certified and licensed interpreter. Wadas insisted on a licensed interpreter. Regardless, Chief Hasker communicated through Ms. Nichols even after Wadas had indicated he did not want to communicate with an interpreter who was not licensed.

As a result of this communication, unsuccessful attempts were made to contact Wadas' attorney, and eventually, Chief Hasker concluded that Wadas refused the chemical test.

Wadas' statements that he wanted to consult with his attorney prior to taking a chemical test were made before Wadas was provided with a licensed interpreter as he specifically requested. They were made through the unlicensed and uncertified interpreter. Therefore, as we understand the statutes, those statements could not be properly considered evidence that he refused to take the test.

The fact that Wadas communicated through Ms. Nichols cannot be construed as a waiver of his demand for a licensed interpreter. The statute obviously contemplates that there may be communication attempts by the deaf person even though the deaf person is not provided the assistance the deaf person requests. Otherwise, there would be no need to have a rule excluding such communications from evidence.

The Department of Revenue argues that requiring an interpreter to meet specific statutory qualifications would place an undue burden upon rural police departments. We assume that the General Assembly considered the potential burden in adopting the statute. The General Assembly, in seeking to protect the rights of the hearing impaired, chose to require a "qualified" interpreter for many legal and administrative purposes. *See, e.g.*, Section 476.753.2. It does not seem odd that the legislature

---

**3.** Section 209.285(13), the definition section for the statute outlining the certification procedures for licensing interpreters for the deaf, states:

(13) "Interpreter", any person who offers to render interpreting services implying that he or she is trained, and experienced in interpreting, and holds a current, valid certification and license to practice interpreting in this state; provided that a telecommunications operator providing deaf relay service or a person providing operator services for the deaf shall not be considered to be an interpreter;

would require such qualification of interpreters when a deaf person is undergoing interrogation in connection with a suspected criminal offense.

It is not clear that Wadas ever asked for an interpreter in the first place. His position might have been that if the Chief wished to provide assistance by an interpreter, it must be a licensed interpreter. If Chief Hasker had been content to handle the communication through pen and paper (and if Wadas had also been content with that), the use of pen and paper would have been in compliance with the statute as "auxiliary aids." Needless to say, the burden of compliance in that case would have been minimal.

While neither party mentions the Americans with Disabilities Act, we would note that the Missouri statutes differ from Title II of the Americans with Disabilities Act (in focusing on the "*expressed* need" of the deaf person rather than an objectively determined "effective means of communication"). *See* 42 U.S.C. § 12101 *et seq.*[4]

The interpreter procured by the Police Department was not certified and licensed. Nor is there evidence that she was deemed competent by the Missouri Commission for the Deaf and Hard of Hearing. Therefore, we are required under Section 476.753.2 to rule that Wadas' statements made through the uncertified and unlicensed interpreter cannot be considered as evidence. The Director makes no argument that, even

apart from the statements made through the interpreter, there was otherwise sufficient evidence of refusal. Thus, we are compelled to reverse the revocation.

### Conclusion

The judgment of the trial court affirming the revocation of the license is reversed.

EDWIN H. SMITH and BRECKENRIDGE, JJ., concur.

---

4. A local police department is a "public entity" within the meaning of Title II of the ADA. *Gorman v. Bartch*, 152 F.3d 907, 912 (8th Cir.1998). The Federal Regulations under Title II, set forth at 28 C.F.R. § 35.160 (2006), specify that "[a] public entity shall furnish appropriate auxiliary aids and services where necessary [to ensure communication]." The regulations also specify that in determining what type of aid or service is necessary, the public entity shall give "primary consideration" to the requests of the individual, and

shall "honor" that choice unless it can demonstrate "that another effective means of communication exists." *See People v. Long*, 296 Ill.App.3d 127, 230 Ill.Dec. 509, 693 N.E.2d 1260 (1998).

Section 476.753.2, in contrast to the ADA states that services are to be provided "based on the deaf person's expressed needs." Here, the deaf person (Wadas) insisted on a licensed interpreter. The State does not deny that this was "an expressed need."