

# In the Missouri Court of Appeals
# Eastern District

## DIVISION ONE

IN THE INTEREST OF: D.A.B. AND B.M.S. )

No. ED106393
(Consolidated with ED106394)

Appeals from the
Circuit Court of Pike County

Honorable David Ash

FILED: February 26, 2019

## OPINION

In this consolidated appeal, B.S. ("Father") and R.B. ("Mother") (collectively, "Appellants") separately appeal from the judgment of the circuit court terminating their parental rights to D.A.B. and B.M.S. (the "Children").

Father raises one point on appeal, arguing the trial court erred in terminating his parental rights because the Children's Division of the Missouri Department of Social Services ("Children's Division") repeatedly failed to provide interpretive services he was entitled to as a deaf person under Section 476.753 RSMo (Cum. Supp. 2007) and Nondiscrimination on the Basis of Disability in State and Local Government Services, 28 C.F.R. § 35.160, a federal regulation promulgated under Title II of the Americans With Disabilities Act (the "ADA"), 42

U.S.C. § 12132 (1990). *See* Nondiscrimination on the Basis of Disability in State and Local Government Services, 75 Fed. Reg. 56,164 (Sept. 15, 2010).

Mother raises four points on appeal, arguing the court erred in terminating her parental rights because: (1) the court lacked jurisdiction, in that the Children's Division failed to serve the foster parents and failed to properly serve any of the parties, as required by Section 211.453 RSMo (2000); (2) the Children's Division failed to place the Children in her custody as the non-offending parent, as required by Section 211.037 RSMo (Cum. Supp. 2007); (3) the Children's Division failed to make reasonable efforts to eliminate the need for removal of the Children from their parents, as required by Section 211.183 RSMo (Non-Cum. Supp. 2014) and Section 211.565 RSMo (Cum. Supp. 2012); and (4) the Children's Division failed to provide basic necessary services for Mother, Father, and the Children, as required by Section 211.455.3 RSMo (Non-Cum. Supp. 2014), including sign language interpreters, sign language training for the Children, and assigning a local caseworker to interact with Mother while she was living in Springfield, Missouri.

We dismiss Mother's claims in Points I, II, and III for failure to comply with Rule 84.04, and affirm the judgment terminating Appellants' parental rights.

Factual and Procedural Background[1]

Father and Mother have both been deaf since childhood and graduated from the Missouri School for the Deaf. Although Father and Mother generally communicate through sign language interpreters, they can both read, write, and understand English. Mother is also able to read lips.

---

[1] In reviewing the evidence, we defer to the trial court's factual findings and credibility determinations. *In re J.P.B.*, 509 S.W.3d 84, 90 (Mo. banc 2017). Conflicting evidence is reviewed in the light most favorable to the trial court's judgment. *Id*. When the evidence poses two reasonable but different inferences, we defer to the trial court's assessment of the evidence." *Id*.

The Children, who are hearing, speak English and also have a limited ability to use sign language.

On July 16, 2014, the Children's Division assumed jurisdiction over the Children following a hotline call alleging neglect, lack of housing, lack of food, lack of shelter, and also physical abuse. The Children were staying with Father at the time. Mother was out of the area and had left the Children with Father.

Upon taking the Children into custody, the Children's Division did not have Mother's current contact information and there was no other appropriate placement identified. When Mother learned that the Children had been taken into custody, she contacted the Children's Division. However, the Children's Division did not place the Children in Mother's custody because Mother's housing situation was unstable and inappropriate for the Children.

The juvenile court entered an initial order placing the Children in protective custody on July 17, 2014. Following a hearing on July 21, 2014, the juvenile court ordered that the Children "remain in protective custody pending further proceedings and in the temporary legal custody of the Children's Division for suitable physical placement." The Children were then immediately placed into foster care and have remained with the same foster family since June of 2015.

Shortly after the Children were taken into custody, the Children's Division considered placement with a family member, but was unable to find an appropriate place. Mother's sister was considered after she contacted the Children's Division. However, the Children were never placed with the sister because, as the caseworker testified, "[t]here was no follow-through on [the sister]'s part of getting us information, us being able to do a walk-through of her home, us doing background checks."

On August 18, 2014, Father entered into a Written Service Agreement ("Service Agreement") with the Children's Division in which he agreed to numerous tasks regarding five domains to secure reunification with the Children. Specifically, Father agreed to the following:

- obtaining and maintaining stable housing to provide a safe and sanitary environment for the Children;
- providing an environment for the Children that is free of violence, illegal activities and sexually based activities or materials;
- developing and maintaining a healthy relationship with the Children consisting of demonstrating appropriate parenting skills, bonding, and discipline in order to allow him to develop a health, appropriate relationship with the Children;
- taking necessary steps to address any of his own emotional, physical, mental health needs in order to provide healthy parenting for the Children; and
- cooperating with efforts made by the Children's Division and Family Court to assist in the reunification process and have contact with the Children.

For each domain, Father's Service Agreement identified specific tasks he agreed to perform in furtherance of each stated goal.

After reading the Service Agreement, Father signed it and initialed statements indicating he was involved in the development of the Service Agreement, agreed with the conditions set forth therein, and was notified of and understood his rights with regard to services provided by the Children's Division. There was no evidence at trial that Father did not understand what he read.

The Children's Division provided Father with numerous services during the two and a half years the Children were in custody, including: referrals to various agencies to assist Father with his financial and housing needs; parenting classes; family counseling; a psychiatric evaluation, prescriptions for medications to treat his episodic mood disorder, intermittent explosive disorder and ADHD; and referrals for therapy.

Despite these services and assistance, Father failed to make significant progress on any of the goals set out in the Service Agreement. Father constantly changed residences without informing the Children's Division, occasionally had no place to live, and never obtained a

4

residence with an appropriate place for the Children to sleep. At the time of trial, the conditions of neglect persisted. Father was living in a trailer with no working bathroom, unsanitary conditions, and no place for the Children to sleep. Although Father eventually completed parenting classes, he was unable to demonstrate what he learned or use the skills to develop a healthy relationship with the Children. Father consistently visited the Children every week, however he spent the time using his phone or tablet instead of interacting with the Children. Generally, Father failed to pay attention to the Children's basic needs, causing a caseworker to intervene during supervised visits on several occasions. During the visits, there "[did] not appear to be a significant emotional tie from the [C]hildren to the parents." Additionally, Father was unable to take care of his financial and housing needs. Father failed to take steps to address his psychiatric problems, at one point took himself off his medications without consulting a physician, and failed to follow through with appointments for therapy or counseling sessions.

The Children's Division also developed a Service Agreement for Mother, which contained the same domains and goals as Father's Service Agreement. Mother initially refused to sign her Service Agreement, stating she wanted to speak with an attorney. Mother eventually signed the initial Service Agreement on June 31, 2015, but refused to sign several subsequent Service Agreements. The Children's Division provided Mother with numerous services and substantial assistance, however Mother would constantly move or leave town without notifying the Children's Division for several weeks or months at a time. The assistance and services provided to Mother included: referrals to various agencies to assist Mother with her financial and housing needs; parenting classes; family counseling; domestic violence classes; a psychiatric evaluation; and referrals for therapy to treat her episodic mood disorder, adjustment disorder, and depression.

5

Like Father, Mother also failed to make significant progress on any of the goals in her Service Agreement. She relocated frequently, sometimes staying out of Missouri for several weeks or months at a time. Her housing remained inappropriate and had no room for the Children. Mother regularly failed to notify the Children's Division of her change of address, and failed to communicate with the Children's Division at all for months at a time. Unlike Father, Mother was not consistent in visiting the Children. When Mother did attend visitations, she largely ignored D.A.B. and B.M.S. Although Mother acknowledged she had issues with domestic violence related to Father's violent temper and had a protective order against Father, she did not follow through with resources provided by the Children's Division to assist with this issue. Mother completed a parenting class, but failed to demonstrate any of the parenting skills she learned. Mother also disregarded referrals for counseling and family therapy. Mother did not complete any of the tasks to demonstrate an ability to protect the Children.

For the first year and a half of the case, the Children's Division did not provide Appellants with sign language interpreters. However, Appellants admitted family members who could sign served as interpreters or Appellants would use written notes to communicate with the Children's Division.

Prior to January 2016, neither Father nor Mother complained to the Children's Division that they could not understand what was required of them or requested that the Children's Division provide sign language interpreters.[2] The Children's Division did not believe communication was a problem at that point because Father "seemed okay with what we were doing." However, in January of 2016, Father requested an interpreter, and the Children's

---

[2] We acknowledge Appellants testified Father requested interpreters early in the case, there was no interpreter for several meetings, and the Children's Division informed Appellants they would have to provide their own interpreters. However, our standard of review requires us to resolve any conflicts in the evidence in the light most favorable to the judgment. *See In re J.P.B.*, 509 S.W.3d at 90.

6

Division provided a qualified[3] sign language interpreter for every meeting and home visit from that point on. The Children's Division did not provide interpreters for any of the visits with the Children as the Children knew some sign language and were able to communicate with Father and Mother. The Children's Division did, however, provide the Children with limited sign language training to maintain and develop their sign language abilities and facilitate communication with Father and Mother. Throughout the pendency of these proceedings, an interpreter, whether qualified or not, was present for every family support team meeting, including the meetings where Appellants were presented with their Service Agreements.

On March 7, 2017, the Children's Division filed a report recommending that the parental rights of Mother and Father be terminated due to the "lack of progress on their Written Service Agreement." The trial court held a bench trial, during which evidence supporting the aforementioned facts was presented. At trial, Appellants argued, *inter alia*, termination was not warranted because the Children's Division failed to provide sign language interpreters, as required by both Missouri and federal law. More specifically, Appellants argued sign language interpreters were not provided during numerous meetings with the Children's Division prior to January 2016, and that interpreters were not provided during visits with the Children.

After hearing all of the evidence, the trial court issued its judgment concluding that clear, cogent, and convincing evidence supported the termination of both Father's and Mother's parental rights pursuant to Section 211.447.5(3) RSMo (2016), and that termination was in the best interest of the Children. Specifically, the trial court found the harmful conditions that led to the Children coming into custody of the Children's Division "have continued to exist for both

---

[3] Under Section 476.750 (RSMo Cum. Supp. 2007), "qualified interpreter" is defined as: "an interpreter certified and licensed by the Missouri interpreter certification system or deemed competent by the Missouri commission for the deaf and hard of hearing, who is able to interpret effectively, accurately and impartially both receptively and expressively, using any necessary specialized vocabulary."

parents . . . . They had not been remedied by the time of trial and there was no prospect for any real change in the conditions of either parent." In reaching this conclusion, the trial court expressly rejected Appellants' assertion that the lack of interpreters was a factor in Appellants' failures to comply with the terms of their Service Agreements or rectify the conditions of neglect.

Appellants filed a motion for a new trial reasserting their argument that termination was not warranted due to the Children's Division's failure to provide sign language interpreters, as required by Missouri and federal law, citing Section 476.753 and 28 C.F.R. § 35.160. The trial court denied the motion. This appeal follows.

<u>Discussion</u>

## I.   Compliance with Mandatory Briefing Requirements of Rule 84.04

Before proceeding to the analysis of Appellants' arguments, we direct Appellants' attention to Missouri Supreme Court Rule 84.04 (2018),[4] regarding the requirements for the contents of appellate briefs.

Rule 84.04(c) requires appellants to include "a fair and concise statement of the facts relevant to the questions presented for determination without argument." *See Johnson v. Buffalo Lodging Assocs.*, 300 S.W.3d 580, 581 (Mo. App. E.D. 2009). While Mother's brief includes a statement of facts, it entirely ignores relevant facts in the record related to Mother's points on appeal. For example, the only time Mother mentions a sign language interpreter in her statement of facts is to say "the Children's Division approached [Father] and communicated with him about the removal of his children from his home without the assistance of an interpreter." Mother fails to include any facts regarding the presence or absence of interpreters during meetings

---

[4] All rule references are to Missouri Supreme Court Rules (2018).

8

relevant to her claims. Mother also fails to include any facts related to her claim that the court lacked jurisdiction due to improper service or failure to join a necessary party. Where a statement of facts fails to comply with Rule 84.04(c), dismissal of the appeal is warranted. *Id*.

Rule 84.04(d)(5) requires appellants to "include a list of cases, not to exceed four, and the constitutional, statutory, and regulatory provisions or other authority upon which that party principally relies." Mother's brief fails to comply with Rule 84.04(d)(5) in that it does not cite any appropriate precedent to support her claims of error. *See Brown v. Ameristar Casino Kan. City, Inc.*, 211 S.W.3d 145, 147-48 (Mo. App. W.D. 2007). Mother's entire brief contains only one citation to a single case in Point I of her argument, *In re S.M.H*, which does not support or even address her claim that the trial court lacked jurisdiction. *See In re S.M.H.*, 170 S.W.3d 524, 530 (Mo. App. E.D. 2005) (discussing policy of strictly construing statutes that provide for termination of parental rights in favor of parent and preservation of parent-child relationship).

> An argument should show how the principles of law and the facts of the case interact. An appellant has an obligation to cite appropriate and available precedent if he expects to prevail, and, if no authority is available to cite, he should explain the reason for the absence of citations. When the appellant neither cites relevant authority nor explains why such authority is not available, the appellate court is justified in considering the points abandoned and dismiss[ing] the appeal.

*Brown*, 211 S.W.3d 145, 147-48 (Mo. App. W.D. 2007) (quotations and citations omitted); *see State ex rel. Scherschel v. City of Kan. City*, 470 S.W.3d 391, 399 (Mo. App. W.D. 2015). "An argument section that presents no legal arguments for reversal and that contains no citations to legal authorities violates Rule 84.04(e) and preserves nothing for appellate review." *Pennington-Thurman v. Bank of Am., N.A.*, 486 S.W.3d 471, 479 (Mo. App. E.D. 2016).

Both Mother and Father fail to comply with Rule 84.04(e), which requires appellants to include in their argument for each claim of error "a concise statement describing whether the error was preserved for appellate review; if so, how it was preserved; and the applicable standard

of review." Rule 84.04(e), *see In re V.C.N.C.*, 458 S.W.3d 443, 450 (Mo. App. E.D. 2015).

Neither Mother nor Father provide a standard of review for any of the claims of error, nor do they describe if or how their claims have been preserved for appeal. "The standard of review is an essential portion of all appellate arguments; it outlines this court's role in disposing of the matter before us." *Id.* (quotations and citation omitted). "The standard of review is the lens through which this court views the rulings and actions of the trial court and the facts as determined in the trial court." *Chorum v. Chorum*, 469 S.W.3d 484, 488 (Mo. App. S.D. 2015). "Any argument claiming trial court error not premised upon and constructed around the correct standard of review offers us no more than an out-of-focus view of the claimed error and is of little, if any, analytical value in evaluating it." *Id.* Appellants' arguments exemplify this deficiency. "While it would be easy enough for this court to determine the applicable standard of review, it is not our duty to supplement the deficient brief with our own research." *In re V.C.N.C.*, 458 S.W.3d at 447.

Finally, Rule 84.04(e) also provides that: "All factual assertions in the argument shall have specific page references to the relevant portion of the record on appeal, i.e., legal file, transcript, or exhibits." Mother's argument repeatedly discusses facts without providing any record citation. In some cases, the facts cited appear to be to documents not even contained in the record, such as her citation to "six reports submitted [to the juvenile court] between September 25, 2014 and May 20, 2016." "[C]ourts cannot spend time searching the record to determine if factual assertions in the brief are supported by the record." *Johnson*, 300 S.W.3d at 581.

The briefing requirements of Rule 84.04 are mandatory, and the failure to substantially comply with Rule 84.04 preserves nothing for review. *Brown*, 211 S.W.3d at 147. However, we have discretion to review noncompliant briefs *ex gratia* "where the argument is readily

understandable." *See Scott v. King*, 510 S.W.3d 887, 892 (Mo. App. E.D. 2017). "But we cautiously exercise this discretion because each time we review a noncompliant brief *ex gratia*, we send an implicit message that substandard briefing is acceptable. It is not." *Id*.

We decline to review Mother's claims in Points I, II, and III because her brief is so substantially deficient that we cannot address her claims without improperly becoming an advocate. *See Brown*, 211 S.W.3d at 147 (purpose of Rule 84.04 is to "ensure that appellate courts do not become advocates by speculating on facts and arguments that have not been made").[5] Accordingly, Mother's Points I, II, and III are dismissed. However, we will exercise our discretion to review Father's claim because the deficiencies in his brief are less substantial and we can ascertain and address his argument without becoming an advocate. We review *ex gratia* Mother's claim in Point IV to the extent it is similar to Father's claim, and address these claims together.

## II. Evidence Supporting Termination of Parental Rights

In Father's sole point on appeal, he argues the trial court erred in terminating his parental rights because the Children's Division failed to comply with 28 C.F.R. § 35.160 and Section 476.753 by failing to provide "interpretive services" and relying on family members as sign language interpreters, "resulting in Father's inability and failure to comply with the requirements of the Children's Division and the Juvenile Court to regain legal and physical custody of his children, which resulted in the termination of [Father]'s parental rights [for the Children]." Similarly, Mother argues the trial court erred in ordering the termination of her parental rights

---

[5] Additionally, it appears Mother's claims of error in Points I, II, and III are being raised for the first time on appeal. Although there was some testimony related to the issue in Point II and III, we cannot find anything in the record before us indicating Mother raised these objections or made these arguments to the trial court. As explained above, Mother omitted any explanation in her brief regarding whether these points are preserved for appeal. Addressing these points would require us to become an advocate by combing the record in search of facts supporting her appeal, which we will not do. *See U.S. Bank Nat'l Ass'n v. Christensen*, 541 S.W.3d 16, 21 (Mo. App. E.D. 2018).

because the Children's Division failed to provide basic necessary services for Appellants or the Children, in order to reunify Appellants with the Children, including by failing to provide sign language interpreters for Appellants and failing to provide sign language training for the Children.[6]

The issue in both of Appellants' claims is whether a decision to terminate the parental rights of a deaf parent due to their failure to rectify conditions of neglect, pursuant to Section 211.447.5(3), should be reversed because the Children's Division communicated with the parents by relying on written notes and family members as sign language interpreters for the first year and a half of the proceedings. Based on the unique facts and circumstances of this particular case, we find the decision to terminate parental rights should be affirmed.

Our standard of review for a trial court's decision to terminate parental rights is "'whether clear, cogent, and convincing evidence was presented to support a statutory ground'" for the termination "'under *Murphy v. Carron*, 536 S.W.2d 30 (Mo. banc 1976).'" *In re V.C.N.C.*, 458 S.W.3d at 447 (quoting *In re Adoption of C.M.B.R.*, 332 S.W.3d 793, 815 (Mo. banc 2011)). We will affirm the trial court's judgment unless there is no substantial evidence to support it, it is against the weight of the evidence, or it erroneously declares or applies the law. *In re V.C.N.C.*, 458 S.W.3d at 447. We will only reverse if we are left with a firm belief that the order is wrong. *Id*. We defer to the trial court's factual findings and credibility determinations, and will not reweigh the evidence. *In re J.P.B.*, 509 S.W.3d at 90. "In reviewing questions of fact, the reviewing court is to recognize that the circuit court is free to disbelieve any, all, or none of the evidence, and it is not the reviewing appellate court's role to re-evaluate the evidence

---

[6] Unlike Father's claim, Mother also argues in Point IV the Children's Division failed to assign a local caseworker to interact with Mother. We decline to address this portion of Mother's argument because, as explained above, Mother's substantial failure to comply with the briefing requirements of Rule 84.04 prevent us from being able to address her claim without becoming an advocate. *See U.S. Bank Nat'l Ass'n*, 541 S.W.3d at 21.

through its own perspective." *Id*. (quotations omitted). "Conflicting evidence will be reviewed in the light most favorable to the trial court's judgment." *Id*.

### A.      *Evidence Supporting Termination of Parental Rights*

The trial court terminated Appellants' parental rights under Section 211.447.5(3), which provides, in relevant part, that the Children's Division may file a petition to terminate an individual's parental rights over a child when:

> The child has been under the jurisdiction of the juvenile court for a period of one year, and . . . conditions of a potentially harmful nature continue to exist, that there is little likelihood that those conditions will be remedied at an early date so that the child can be returned to the parent in the near future, or the continuation of the parent-child relationship greatly diminishes the child's prospects for early integration into a stable and permanent home.

When determining whether to terminate parental rights under Section 211.447.5(3), the trial court must consider and make findings on the following four factors:

> (a) The terms of a social service plan entered into by the parent and the division and the extent to which the parties have made progress in complying with those terms;
> (b) The success or failure of the efforts of the juvenile officer, the division or other agency to aid the parent on a continuing basis in adjusting his circumstances or conduct to provide a proper home for the child;
> (c) A mental condition which is shown by competent evidence either to be permanent or such that there is no reasonable likelihood that the condition can be reversed and which renders the parent unable to knowingly provide the child the necessary care, custody and control;
> (d) Chemical dependency which prevents the parent from consistently providing the necessary care, custody and control over the child and which cannot be treated so as to enable the parent to consistently provide such care, custody and control[.]

211.447.5(3)(a)-(d). "The ultimate issue when applying Section 211.447.5(3) is the continued existence of an unremedied, neglectful situation." *In re V.C.N.C.*, 458 S.W.3d 443, 450 (Mo. App. E.D. 2015) (quoting *In re G.G.B.*, 394 S.W.3d 457, 471 (Mo. App. E.D. 2013)).

Here, the trial court addressed each of the factors it was required to consider in Section 211.447.5(3), and found the first two factors weighed in favor of termination. Specifically, the

trial court found the Children's Division provided substantial services to Appellants. The court also found Appellants each repeatedly failed to comply with the terms their Service Agreements. The trial court noted Appellants' failures to make progress on any of the five domains they agreed to pursue in order to regain custody of their children, as well as their repeated failures to follow through on the services provided by the Children's Division. The court also noted the continued existence of the same types of neglectful conditions that led the Children's Division to take custody of the Children in the first place. Finally, the trial court found "there was no real prospect for any real change in the conditions of either parent."

Based on our review of the record, we find each of these findings is supported by clear, cogent, and convincing evidence, including testimony from multiple employees of the Children's Division who were assigned to Appellants' cases, as well as the Children's foster mother and the paternal grandfather, all of whom testified regarding the continued conditions of neglect. Indeed, neither Father nor Mother challenge the trial court's findings that they failed to make progress on the domains in their Service Agreements and failed to rectify the conditions of neglect. Because "the continued existence of an unremedied, neglectful situation" is the "ultimate issue" under Section 211.447.5(3), we find the trial court did not err in terminating Appellants' parental rights. *See In re V.C.N.C.*, 458 S.W.3d at 450.

### B. Failure to Provide Qualified Sign Language Interpreters

Appellants argue, despite the existence of evidence supporting the trial court's decision, the trial court nonetheless erred in terminating their respective parental rights because Appellants' failures to make progress on their Service Agreements or rectify the conditions of neglect were caused by the Children's Division's failure to provide sign language interpreters for them and sign language training for the Children.

To the extent Appellants' claim the Children's division failed to provide sign language interpreters and sign language training to facilitate Appellants' communication *with the Children*, we are not left with a firm belief that the trial court was wrong in concluding that Appellants were able to communicate effectively with the Children. We defer to the trial court's factual findings that the Children were provided with sign language training, and Appellants had no problems communicating with the Children. As factfinder, it was the trial court's province to weigh the evidence, and our standard of review does not allow us to reweigh the evidence or second guess the factual determinations of the factfinder. *See In the Interest of K.L. v. T.L.*, 561 S.W.3d 12, 21 (Mo. App. W.D. 2018). The testimony from the foster mother and the paternal grandfather alone supports that Appellants were able to communicate effectively with the Children without interpreters, but instead choose not to interact and foster a bond toward reunification. The court apparently found this testimony more credible than Appellants' testimony, and we are bound by the trial court's credibility determinations. *In re J.P.B.*, 509 S.W.3d at 90. Therefore, we cannot say the trial court erred in finding a lack of sign language interpreters and sign language training for the Children did not impede Appellants' ability to effectively communicate with the Children.

We agree with Appellants that the Children's Division had an obligation to ensure effective communication between Appellants and the Children's Division, as required by both Missouri and federal law. Nonetheless, as explained below, we affirm the trial court's finding that the lack of qualified sign language interpreters was not the cause of Appellants' failure to comply with their Service Agreements or to rectify the conditions of neglect that necessitated removing the Children from Appellants' custody.

15

The Children's Division does not contest that it was required to comply with Section 476.753[7] and 28 C.F.R. § 35.160.[8] Instead, The Children's Division argues it complied with the requirements of both laws.[9] Specifically, the Children's Division asserts Appellants were not entitled to interpreters because, as the trial court found, Appellants never requested the assistance of an interpreter prior to January of 2016. Therefore, the Children's Division argues, Appellants never "expressed" their need for a sign language interpreter, as required by Section 476.753.[10]

---

[7] The Children's Division argues the words "judicial or quasi-judicial proceedings" in Section 476.753.1(1) "[cannot] be stretched to cover any and all meetings, home visits or supervised visits with the children." We disagree. The scope of Section 476.753 in the context of juvenile proceedings is governed by subsection (2), which the Children's Division does not cite or discuss. The interactions between Appellants and the Children's Division were all related to juvenile proceedings in which the juvenile court assumed jurisdiction over the Children and placed the Children in the legal custody of the Children's Division. In order to seek reunification with the Children, Appellants were required to communicate regularly with the Children's Division, attend family support meetings and other meetings, allow scheduled and unscheduled home visits by Children's Division staff, and participate in visitations with the Children, most of which were supervised by the Children's Division at its office. Each of these interactions with the Children's Division was documented by Children's Division employees, compiled into progress reports that were filed with the juvenile court, and relied on by the juvenile court to issue orders regarding the continued custody over the Children. Accordingly, we find every interaction between the Children's Division and Appellants that was related to the underlying juvenile proceedings constituted an "investigation," "interview," or "other proceeding" within the scope of Section 476.753.1(2).

[8] "Courts have broadly construed the 'services, programs, or activities' language in the ADA to encompass 'anything a public entity does.'" *Bahl*, 695 F.3d at 787. "Parents or guardians, including foster parents, who are individuals with disabilities, may need to interact with child services agencies on behalf of their children; in such a circumstance, the child services agencies would need to provide appropriate auxiliary aids and services to those parents or guardians." Nondiscrimination on the Basis of Disability in State and Local Government Services, 75 Fed. Reg. at 56,223.

[9] Although we cannot reweigh the evidence, we acknowledge there was testimony that the Children's Division was "not aware" of any state or federal laws requiring it to provide sign language interpreters to the deaf Appellants. It is incumbent upon the Children's Division to be knowledgeable about the legal requirements to provide auxiliary aids and services for deaf persons. Any lack of knowledge regarding requirements for providing qualified sign language interpreters under Missouri and federal law could result in a substantial injustice.

[10] As to Father's argument regarding 28 C.F.R. § 35.160, the Children's Division asserts its arguments addressing compliance with Section 476.753 also apply to 28 C.F.R. § 35.160 because "Section 476.753 RSMo was passed by the legislature to be in compliance with the ADA." While we do not dispute that Section 476.753 was intended to comply with the ADA, it is just one part of the "broad statutory scheme" including other "related statutory provisions . . . designed to insure that interpreters will be available to assist deaf persons in virtually every judicial or administrative setting where such a person may be a witness, a party, or an accused." *See State v. Wilson*, 169 S.W.3d 571, 575 (Mo. App. W.D. 2005). Courts have also recognized that Section 476.753 and related Missouri statutes "differ from Title II of the ADA," specifically with regard to a central issue in this case, whether Appellants were required to express the need for an interpreter before the Children's Division was required to provide one. *See Wadas v. Dir. of Revenue*, 197 S.W.3d 222, 227 (Mo. App. W.D. 2006). The fact that the scope of Section 476.753 is more narrow than 28 C.F.R. § 35.160 does relieve the Children's Division of its duty to comply with the greater protections provided under the ADA. *See* 42 USCS § 12201(b) (federal preemption clause of the ADA).

Pursuant to Section 476.753, the Children's Division, as a "designated responsible authority," was required to "provide, based on a deaf person's expressed needs, auxiliary aids and services *to interpret* the proceedings to a deaf person and, if a deaf person gives testimony or other communication, *to interpret* the deaf person's testimony or other communication" in certain "proceedings." Section 476.753.1 (emphasis added). Under Section 476.753.1(2), "proceeding" is broadly defined to include, *inter alia*, "any stage" of a "juvenile proceeding," including but not limited to "any . . . investigation, interview or any other proceeding regarding the juvenile that is authorized by or held under the supervision of a court."

Pursuant to 28 C.F.R. § 35.160, "public entities," such as the Children's Division, are required to "take appropriate steps to ensure that communications with applicants, participants, members of the public, and companions with disabilities are *as effective as communications with others*" and "furnish appropriate auxiliary aids and services where necessary to afford individuals with disabilities . . . an equal opportunity to participate in, and enjoy the benefits of, a service, program, or activity of a public entity." 28 C.F.R. § 35.160(a)-(b) (emphasis added). In the case of a deaf person whose primary language is American Sign Language, "appropriate auxiliary aids and services" include providing a qualified sign language interpreter "when the information being communicated is complex, or is exchanged for a lengthy period of time." Nondiscrimination on the Basis of Disability in State and Local Government Services, 75 Fed. Reg. at 56,224; *see also Loye v. Cnty. of Dakota*, 625 F.3d 494, 498-99 (8th Cir. 2010).

It is undisputed that the Children's Division was aware that Appellants are deaf and communicate through sign language interpreters. The Children's Division admitted, both in trial testimony as well as in its brief,[11] it predominantly relied on Appellants' family members to

---

[11] The statement of facts in Children's Division's brief states: "[T]estimony by [Children's Division] witnesses was that [Father] had uncertified interpreters in his case before January, 2016, and certified interpreters after January,

17

serve as sign language interpreters prior to January of 2016, and communicated through written notes when Appellants did not bring an interpreter.

### i. Children's Division's Reliance of Written Notes

Under Missouri law, the use of "written materials," such as exchanging written notes, is permitted as "auxiliary aids and services"[12] when this is "the device or service that the deaf person feels would best serve him or her," or when this is "equally effective" as the device or service the deaf person prefers. Section 476.750(1) and (4); *see Wadas v. Dir. of Revenue*, 197 S.W.3d 222, 226 (Mo. App. W.D. 2006) (noting that exchanging written notes may comply with Section 476.753). Section 476.750(4) places an affirmative duty upon the Children's Division to "provide an opportunity for the qualified individual with a disability to designate the auxiliary aid or service of his or her choice." Section 476.756 provides that, *before* any auxiliary aid or service is provided, the Children's Division and the deaf person must collectively "make a preliminary determination that the qualified interpreter or auxiliary aids and services are able to interpret effectively, accurately and impartially the statement of the deaf person and interpret the proceedings effectively, accurately and impartially to the deaf person."

Under 28 C.F.R. § 35.160, exchanging written notes and relying on family members as interpreters to communicate with deaf individuals is permitted in limited and narrow circumstances. The type of "auxiliary aid or service"[13] a public entity, such as the Children's

---

2016, during most of [Father]'s visits with the children and meetings with the Children's Division, and utilized written notes between himself and [Children's Division] employees, with [Father]'s agreement, prior to January, 2016, as well."

[12] Section 476.750(1) defines "auxiliary aids and services" as "the device or service that the deaf person feels would best serve him or her which includes, but is not limited to, qualified interpreters, notetakers, transcription services, written materials, assistive listening devices, assistive listening systems, closed caption decoders, open and closed captioning, videotext displays or other effective method of making aurally delivered materials available to individuals with hearing loss as defined by the Americans with Disabilities Act of 1990."

[13] The ADA defines "auxiliary aids and services" as including: "(A) qualified interpreters or other effective methods of making aurally delivered materials available to individuals with hearing impairments; (B) qualified readers, taped

Division, is required to provide depends on "the method of communication used by the individual; the nature, length, and complexity of the communication involved; and the context in which the communication is taking place." 28 C.F.R. § 35.160(b)(2). In determining what types of auxiliary aids and services are necessary, "primary consideration" is given to the requests of individuals with disabilities. *Id*; *see* Nondiscrimination on the Basis of Disability in State and Local Government Services, 75 Fed. Reg. at 56,185 ("Exchange of notes likely will be effective in situations that do not involve substantial conversation, for example, blood work for routine lab tests or regular allergy shots.").

While the Children's Division relied on written notes to communicate with Appellants during meetings when an interpreter was not present, the record before us is insufficient to ascertain the nature and complexity of these meetings, which is necessary to determine compliance with 28 C.F.R. § 35.160(b)(2).[14] Additionally, there was evidence the Children's Division asked Father about the accommodations they were using to assist him with communication, and Father indicated he was "okay" with what they were doing. However, the record is unclear as to when this conversation occurred, which is necessary to determine whether the Children's Division "provide[d] an opportunity for [Father] to designate the auxiliary aid or service of [his] choice," as required by Section 476.750(4), or made a "preliminary determination" regarding the effectiveness of utilizing written notes, as required by Section 476.756.

---

texts, or other effective methods of making visually delivered materials available to individuals with visual impairments; (C) acquisition or modification of equipment or devices; and (D) other similar services and actions." 42 U.S.C. § 12103(1).

[14] Certain documents referenced during trial or presented to the trial court as evidence are not included in the record before us, including several of the progress reports filed with the court by the Children's Division, as well as "parental home visit checklists" written by the caseworker. These records would be relevant in determining compliance with 28 C.F.R. § 35.160.

### ii. Children's Division's Reliance on Family Members as Interpreters

Pursuant to 28 C.F.R. § 35.160(c)(1), "[a] public entity shall not require an individual with a disability to bring another individual to interpret for him or her." Additionally, public agencies are strictly prohibited from relying on family members or other companions as interpreters except in two narrow circumstances:

> (i) In an emergency involving an imminent threat to the safety or welfare of an individual or the public where there is no interpreter available; or
> (ii) Where the individual with a disability *specifically requests* that the accompanying adult interpret or facilitate communication, the accompanying adult agrees to provide such assistance, and reliance on that adult for such assistance is appropriate under the circumstances.

28 C.F.R. § 35.160(c)(2) (emphasis added).

It is undisputed that Appellants were accompanied by family members who interpreted for Appellants and facilitated communication with the Children's Division for the first year and a half of this case. However, it was factually disputed as to whether Appellants "specifically request[ed]" this accommodation. *See* 28 C.F.R. § 35.160(c)(2)(ii). To the extent the Children's Division relied on Appellants' family members as interpreters during a non-emergency without Appellants first "freely and voluntarily" requesting this as their preferred accommodation, this would be in violation of 28 C.F.R. § 35.160(c)(1) and (2). *See* Nondiscrimination on the Basis of Disability in State and Local Government Services, 75 Fed. Reg. at 56,224 (28 C.F.R. § 35.160 prohibits public entities from "relying on" adults accompanying individuals with disabilities to facilitate communication; "The Department states unequivocally that consent of, and for, the adult accompanying the individual with a disability to facilitate communication must be provided freely and voluntarily both by the individual with a disability and the accompanying third party . . ."). Where there is conflicting evidence, our standard of review requires us to view the evidence

in the light most favorable to the judgment, and disregard all contrary evidence. *See In re J.P.B.*, 509 S.W.3d at 90.

### iii. The trial court's founding that Appellants were able to communicate effectively

Whether the Children's Division complied with 28 C.F.R. § 35.160 is not the issue in this case. As we have previously recognized, a violation of the ADA is not, in and of itself, a ground for reversing a decision to terminate parental rights. *See In re E.T.C.*, 141 S.W.3d 39, 48 (Mo. App. E.D. 2004) (failure to comply with the ADA is "no defense to a termination proceeding").[15] The focus of a termination of parental rights proceeding must be the conduct of the parents and the best interest of the child. *See* Section 211.447.7. The question we must address is whether the trial court correctly determined that, under the circumstances of this case, the "conditions of a potentially harmful nature," which Appellants persistently failed to rectify over the course of three years, were not likely to be "remedied at an early date so that the child can be returned to the parent in the near future."

Under Section 211.447.5(3)(b), one of the factors the trial court was required to consider was "the success or failure of the efforts of the juvenile officer, the division or other agency to aid the parent on a continuing basis in adjusting his circumstances or conduct to provide a proper home for the child[.]" Therefore, the Children's Division's failure to provide qualified sign language interpreters would only be relevant in this case to the extent it contributed to

---

[15] The "vast majority" of other jurisdictions have also recognized that "[t]he ADA is not properly raised as a defense in [a termination of parental] rights proceeding" because the focus of such a proceeding "must be on the parent's rights to the child and the best interests of the child," and "allow[ing] the provision of the ADA to constitute a defense to termination proceedings would improperly elevate the rights of the parent above those of the child." *In re Elijah C.*, 165 A.3d 1149, 1164-65 (Conn. 2017) (citations and quotations omitted) (collecting cases). However, "the fact that the ADA cannot be interposed as a defense in a termination proceeding [does] not [mean] that the ADA does not apply to the reunification services and programs that the department must [provide] to meet the parents' specialized needs," because ADA requires state family services agencies to take into consideration a parent's disability when determining what reasonable efforts to make towards reunification. *Id.* (alterations in original, citations and quotations omitted).

Appellants' failures to make progress on their respective Service Agreements or rectify the conditions of neglect that were the basis of the trial court's decision to terminate their parental rights.

The evidence at trial, when viewed in the light most favorable to the judgment, demonstrates that an interpreter was present when Appellants executed their Service Agreements, the Children's Division stopped relying on family members and written notes to communicate with Father and Mother in January of 2016, and qualified interpreters were provided for more than a year prior to trial. Prior to January 2016, neither Father nor Mother ever complained to the Children's Division that they could not understand what was required of them or requested that the Children's Division provide sign language interpreters. The Children's Division did not believe that communication was a problem at any point during the process because Father and Mother had a family member to interpret for them, or they would use written notes. When the Children's Division asked Father about using interpreters at one point, he "seemed okay with what [they] were doing." Father and Mother do not claim they misunderstood the terms of their Service Agreements, nor do they explain how having a qualified interpreter would have helped them to rectify the conditions of neglect or make more progress towards completing the goals they agreed to complete to reunite with the Children. Significantly, Appellant's failures to rectify the conditions of neglect or make progress on their Service Agreements continued even after the Children's Division began providing qualified interpreters in January of 2016.

Here, the trial court found that Appellants fully understood the terms of their Service Agreements, were aware of what they needed to do to rectify the conditions of neglect, and were able to effectively communicate with the Children's Division and the Children. The trial court

22

stated that, despite the lack of qualified interpreters, Father and Mother never had any problem with communication.[16] The court further stated, "clearly in this case the parents did understand what they were being asked to do to reunite with their children, they just failed to do what was requested, preferring to seek their own goals rather than showing concern for the children." The court also noted "neither [parent] ever complained of an inability to understand until counsel brought up the issue at the trial of this case." The court concluded, "While the presence of interpreters might have forced the parents to pay more attention [to the Children,] there is no evidence that it would have substantially improved the situation. The parents communicated with the [Children] when they felt like it and the [Children] seemed to understand according to all observers of the visits."

We cannot say these findings were unsupported by the evidence or against the weight of the evidence. The trial court's finding that Appellants fully understood the terms of their Service Agreements directly supports its conclusion that the lack of qualified sign language interpreters was not the cause of Appellants' failure to comply with their Service Agreements or rectify the conditions of neglect that necessitated removing the Children from Appellants' custody.

Our opinion should not be interpreted as holding compliance with Section 476.753 and 28 C.F.R. § 35.160 is irrelevant to the analysis of whether parental rights should be terminated. On the contrary, we would have reached a different conclusion if the trial court had found the absence of interpreters impeded Appellants' understanding of the terms of their service plans, or

---

[16] The trial court stated in its judgment that "[T]here is no way [for the Children's Division] to provide the interpreting services at all interactions as counsel suggests. . ." To the extent this suggests the Children's division was not required to provide sign language interpreters at all time required by the ADA, as specified in 28 C.F.R. § 35.160, we disagree. While the trial court found there was no violation of Section 476.753 because Appellants did not demonstrate an "expressed need[]" for interpreters prior to January of 2016, there is no requirement that a deaf person expressly request an interpreter under the ADA. *See Wadas*, 197 S.W.3d at 227 (noting that Section 476.753 differs from Title II of the ADA "in focusing on the 'expressed need' of the deaf person rather than an objectively determined 'effective means of communication'").

impaired their ability to communicate with the Children's Division in any way. Either finding would have been probative of whether there was a "failure of the efforts of the juvenile office. . . to aid the parent on a continuing basis in adjusting his circumstances or conduct to provide a proper home for the child[,]" which is one of the factors the court was required to consider under Section 211.447.5(3). *See supra*, note 15. Additionally, such a finding would have been highly relevant to the court's ultimate determination of whether there was a "likelihood that those conditions [of neglect] will be remedied at an early date so that the child can be returned to the parent in the near future." Section 211.447.5(3).

For the foregoing reasons, we find clear, cogent, and convincing evidence supports the trial court's finding that Appellants failed to rectify the conditions of neglect in this case and that the Children's Division's reliance on written notes and family members to communicate with Appellants did not contribute to Appellants' failures to rectify the conditions of neglect. Accordingly, the trial court did not err in terminating Appellants' parental rights pursuant to Section 211.447.5(3) under the unique circumstances of this case. Father's Point and Mother's Point IV are denied.

### Conclusion

The judgment of the trial court terminating Father's parental rights is affirmed. Mother's appeal is dismissed, in part, and the judgment of the trial court terminating her parental rights is affirmed.

_____
Angela T. Quigless, J.

Roy L. Richter, P.J., and
Robert M. Clayton III, J., concur.