651 S.E.2d 622

**SOUTH CAROLINA DEPARTMENT OF SOCIAL SERVICES, Respondent,**

**v.**

**MOTHER, In the Interest of MINOR CHILD**

---

**Daughter,[1] DOB 06/14/01, Appellant.**

No. 4294.

Court of Appeals of South Carolina.

Submitted Sept. 1, 2007.

Decided Sept. 18, 2007.

1. The names of the minor children and the respective defendants have been changed to protect the minors' identities.

David C. Holler, of Sumter, for appellant.

Deborah Truett Nielsen, of Sumter, for respondent.

WILLIAMS, J.

Mother appeals the family court's termination of her parental rights (TPR) to her daughter (Daughter). Mother suffers from mild mental retardation and argues TPR is inappropriate because the Department of Social Services (DSS) failed to offer specialized services due to Mother's condition. We disagree.

## FACTS

On August 29, 2000, the family court issued an *ex parte* order, granting emergency protective custody of Mother's son (Son) to DSS. Prior to DSS obtaining custody of Son, Mother took Son to the hospital where a medical examination revealed multiple bruises, abrasions, and fractures to his right lower leg. Upon further investigation, it was discovered that both of Son's ankles were broken. Mother explained Son's injuries occurred because he allegedly fell from his stroller. After a finding of neglect against Mother, the family court awarded legal and physical custody of Son to Son's paternal grandmother and his father.

Following DSS taking custody of Son, Robert Noelker, Ph.D., a licensed clinical psychologist, evaluated Mother. DSS received a report from Dr. Noelker, which stated that Mother was functionally illiterate and borderline intellectually deficient with an IQ of 73. Dr. Noelker stated a variety of rehabilitative measures needed to be taken, and without substantial progress by Mother, TPR should be considered.

Mother subsequently gave birth to Daughter on June 14, 2001. By July 10, 2001, an anonymous reporter alerted DSS of Daughter's birth. DSS removed Daughter from Mother's custody partially due to Son's abuse and Mother's failure to explain Son's injuries. Following Daughter's removal, Mother identified Antoine Graham, Daughter's father, as Son's abuser.

On July 23, 2001, DSS made an *ex parte* emergency protective custody request, seeking emergency custody of Daughter

until the probable cause hearing. The family court assented to Daughter remaining in the custody of DSS. Further, the family court held Mother could apply to the Sumter County Family Court for the appointment of a lawyer if she desired a lawyer but could not afford one.

On July 26, 2001, the family court held a probable cause hearing. The court then issued an order on August 14, 2001, finding probable cause existed to place Daughter in the care of DSS pending the merits hearing. The family court ordered that Daughter should remain in the custody of DSS, that Mother must cooperate with DSS, and that Mother could have supervised visitation with Daughter.

On August 20, 2001, Douglas Ritz, Ph.D., a licensed clinical psychologist, re-evaluated Mother. Dr. Ritz determined Mother's intellectual skills were in the mentally deficient range. Dr. Ritz recommended an intervention program to teach Mother how to prevent further abusive situations for her children.

Prior to the merits hearing on August 27, 2001, the family court asked Mother if she had retained an attorney. Mother responded that she did not have an attorney, but she wanted to be represented by counsel. DSS objected to delaying the hearing because Mother had the opportunity to obtain counsel and DSS had an out of town witness. The family court reminded Mother she was advised at the probable cause hearing how to obtain counsel and denied her request for a continuance. Subsequently, the parties reached an agreement, which was approved by the family court, granting custody of Daughter to DSS and visitation to Mother.

The case was reviewed six months after the August 2001 order. At the February 2002 hearing, the family court approved an agreement that continued custody with DSS and allowed Mother to have extended visitation with Daughter.

At the second review hearing on August 15, 2002, the family court stated Mother's visits with Daughter were sporadic, and Mother's apartment was not suitable for Daughter. Further, Daughter's Guardian ad Litem recommended terminating Mother's parental rights. The family court ordered DSS to initiate an action for TPR within ninety days and reduced Mother's visitation to once a month.

On April 10, 2003, the family court approved DSS's permanent plan for TPR and adoption. Since DSS had not filed for TPR within ninety days as ordered in August 2002, the case was set to be reviewed six months later in December 2003. In the December 2003 order, the family court required DSS to file for TPR by January 1, 2004. The court also noted that Mother missed two of her last six visits with Daughter.

On October 2, 2004, the family court terminated Father's parental rights to Daughter based on his failure to visit or support Daughter and his failure to attend parenting and anger management classes. The court declined to terminate Mother's parental rights, but it ordered DSS to provide specialized services consistent with Mother's disabilities and need for housing. At Father's TPR hearing, Mother was represented by counsel and a Guardian ad Litem.

On April 18, 2006, the family court held a final hearing and determined Mother's rights to Daughter should be terminated. At the hearing, Dr. Patrick Goldsmith testified regarding his psychological evaluation of Mother from March 2006. Based on his evaluation, Dr. Goldsmith believed Mother was mildly mentally retarded and stated that Mother "does not believe she has a problem sufficient enough to go to therapy."

The family court terminated Mother's parental rights based on (1) a finding of harm to Daughter under South Carolina Code section 20–7–490 (Supp.2006); (2) neglect under South Carolina Code section 20–7–1572(1) (Supp.2006); (3) failure to remedy conditions leading to Daughter's removal under section 20–7–1572(2); (4) Mother's diagnosable condition under section 20–7–1572(6); and (5) Daughter's custody with DSS for fifteen of the last twenty-two months under section 20–7–1572(8). This appeal follows.

## STANDARD OF REVIEW

In a TPR case, the best interest of the child is paramount. *Doe v. Baby Boy Roe*, 353 S.C. 576, 579, 578 S.E.2d 733, 735 (Ct.App.2003). Before terminating parental rights, the alleged grounds for termination must be proven by clear and convincing evidence. *Richberg v. Dawson*, 278 S.C. 356, 357, 296 S.E.2d 338, 339 (1982); *SCDSS v. Parker*, 336 S.C. 248, 254, 519 S.E.2d 351, 354 (Ct.App.1999). On appeal,

this Court may review the record and make its own determination of whether the termination grounds are supported by clear and convincing evidence. *SCDSS v. Cummings,* 345 S.C. 288, 293, 547 S.E.2d 506, 509 (Ct.App.2001). Despite the broad scope of review, this Court should not wholly disregard the family court's findings because the family court is in a better position to evaluate the credibility of the witnesses and assign weight to their testimony. *Dorchester County Dep't of Soc. Servs. v. Miller,* 324 S.C. 445, 452, 477 S.E.2d 476, 480 (Ct.App.1996).

## LAW/ANALYSIS

### I. Due Process

Mother argues DSS denied her due process and equal protection by seeking removal of Daughter when Mother is functionally illiterate, has borderline intellectual skills, and has not been provided a Guardian ad Litem or an attorney. We disagree.

■ Initially, we note this issue is abandoned because Mother makes a conclusory argument without citation of any authority to support her claim. *See First Sav. Bank v. McLean,* 314 S.C. 361, 363, 444 S.E.2d 513, 514 (1994); *R & G Constr., Inc. v. Lowcountry Reg'l Transp. Auth.,* 343 S.C. 424, 437, 540 S.E.2d 113, 120 (Ct.App.2000).

Additionally, our Supreme Court has declined to address an alleged violation of due process when the family court terminates parental rights pursuant to section 20–7–1572. *SCDSS v. Seegars,* 367 S.C. 623, 633–34, 627 S.E.2d 718, 723–24 (2006); *see also SCDSS v. Headden,* 354 S.C. 602, 613, 582 S.E.2d 419, 425 (2003). We affirm the family court's termination of Mother's parental rights pursuant to South Carolina Code sections 20–7–1572(1), (2), (6), and (8) as well as a finding that termination was in the best interest of Daughter, and therefore, we need not address this argument.

■ Further, section 20–7–1570(A) of the South Carolina Code (Supp.2006) requires appointment of counsel for a parent involved in a TPR case if the parent cannot afford representation. In the case at hand, the family court instructed Mother in 2001 to apply to the Sumter County Family Court for the

appointment of counsel. Mother failed to do this as noted by a subsequent order in September 2001. Despite family court orders, DSS failed to file for TPR until January 2004. However, the family court noted Mother's disabilities and declined to terminate Mother's rights at the TPR hearing in October 2004. At both TPR hearings, Mother was represented by counsel and a Guardian ad Litem. Therefore, DSS did not violate her due process rights.

## II. Specialized Services

Mother argues DSS failed to offer specialized services to Mother as ordered by the family court in 2004. We disagree.

■ Again, Mother fails to cite any authority to support this argument. Therefore, this issue is deemed abandoned. *See McLean,* 314 S.C. at 363, 444 S.E.2d at 514.

■ Even if Mother properly preserved this issue, we find DSS properly provided specialized services to Mother. At Father's TPR hearing in October 2004, the family court ordered DSS "to provide specialized services to [Mother] consistent with her disabilities and need for housing." DSS referred Mother to Sumter Housing Authority in October 2004, to vocational rehabilitation in October 2004, to the Department of Disabilities and Special Needs in 2004, and to Healthy Minds in September 2005. We hold that these referrals comply with the family court's order.

## III. Expert Advice

Mother argues DSS's reasons for TPR are disingenuous because DSS experts advised treatment for Mother's diagnosable condition, which DSS purportedly did not follow. We disagree.

■ Mother fails to cite any authority to support this conclusory argument. Therefore, this issue is deemed abandoned. *Id.*

■ Even if Mother properly preserved this issue, we find DSS's actions were consistent with its experts' advice. Mother appears to argue that DSS's reasons for TPR are in fact the fault of DSS's failure to follow its experts' advice in compliance with the October 2004 family court order.

In April 2006, the family court terminated Mother's parental rights upon finding (1) Daughter or another child in the home suffered harm or neglect, making it unlikely that the home would be made safe within twelve months; (2) Daughter was in DSS's custody over six months, and Mother had not remedied the conditions causing the removal; (3) Mother had a diagnosable condition preventing her from providing minimally acceptable care to Daughter, and the condition was unlikely to change in a reasonable time period; and (4) Daughter had been in DSS custody for fifteen of the last twenty-two months. Additionally, the family court determined termination of Mother's parental rights was in Daughter's best interest.

The reasons for TPR are interconnected, stemming from Mother's dependency problems and mild mental retardation. In 2000, 2001, and 2006, Mother was independently diagnosed with borderline intellectual functioning, mild mental retardation, depressed mood, and dependent personality traits. The dependent personality traits paired with mild mental retardation are likely the reason Mother neglected Son and failed to recognize the seriousness of his abuse. Mother's failure to comprehend Son's abuse was part of the reason the family court initially removed Daughter in 2001.

Mother has failed to address these mental disorders despite the availability of counseling through DSS, including a counselor who provided therapy at Mother's intellectual level. The record indicates Mother failed to make appointments for treatment in 2005. Also, in 2005, a doctor suggested Mother take medication for her conditions, but Mother failed to do so. At trial, Dr. Goldsmith, a psychologist who evaluated Mother in March 2006, testified he did not believe Mother's diagnosable condition would change until "she believes that this is a problem and that she believes that she needs to go to therapy." Therefore, the satisfaction of the TPR statutory elements does not arise from DSS's alleged failure to listen to its experts.

## IV. Accessible Services for the Disabled

Mother argues DSS had a duty to offer accessible services to Mother under the Americans with Disabilities Act (ADA) because DSS knew of Mother's disabilities. We disagree.

The ADA states in part, "Subject to the provisions of this subchapter, no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity." 42 U.S.C.A. § 12132 (Supp.2006). The ADA defines a public entity as "any department, agency, special purpose district, or other instrumentality of a State or States or local government." § 12131(1)(B). Further, a qualified individual with a disability is "an individual with a disability who, with or without reasonable modifications to rules, policies, or practices, the removal of architectural, communication, or transportation barriers, or the provision of auxiliary aids and services, meets the essential eligibility requirements for the receipt of services or the participation in programs or activities provided by a public entity." § 12131(2).

 Previously, this Court addressed an argument that the Rehabilitation Act of 1973 (the Act), 29 U.S.C.A. section 701, *et seq.* (Supp.1976), required DSS to provide social and rehabilitative services for mentally deficient parents. *SCDSS v. Humphreys,* 297 S.C. 118, 122, 374 S.E.2d 922, 925 (Ct.App. 1988). In *Humphreys,* the mother's IQ was 66, which was in the mildly mentally deficient range of intelligence. *Id.* at 119, 374 S.E.2d at 923. This Court rejected the mother's argument that TPR should not occur because DSS failed to provide parenting services tailored to the mother's needs. *Id.* at 122, 374 S.E.2d at 925. We found the purpose of the Act was "to insure that benefits are not denied based upon a handicap," rather than "[to] provide parental training for mentally deficient parents." *Id.* Consequently, when a parent clearly suffers from a diagnosable condition that prevents the parent from providing minimally acceptable care for the child, the Act is not a defense to granting TPR. *Id.* at 122, 374 S.E.2d at 924–25. Our resolution of DSS's duty to provide parental services under the Act is instructive in determining DSS's responsibility to mentally disabled parents under the ADA.[2]

2. *See* Diane L. Kimberlin & Linda Ottinger Headley, *ADA Overview and Update: What Has the Supreme Court Done to Disability Law?,* 19 Rev. Litig. 579, 580–81 (Summer 2000) ("In many respects, the ADA is patterned after the Rehabilitation Act. Because federal courts have developed a considerable body of law interpreting and applying the

While we have yet to uncover any South Carolina case law on whether the ADA requires DSS to make reasonable accommodations and provide services to a parent with mental deficiencies, North Carolina has recently addressed this issue in *In the Matter of C.M.S.*, 646 S.E.2d 592 (N.C.App.2007). In *C.M.S.*, the family court removed the child because the mother's boyfriend sexually abused the child, and the mother failed to prevent this abuse. 646 S.E.2d at 594. The family court subsequently terminated mother's parental rights, finding the mother willfully left the child in foster care for more than twelve months without reasonable progress in correcting the conditions that led to the child's initial removal. *Id.* at 595–96. These conditions included the mother's mental and emotional instability, her inability to locate safe, appropriate housing and maintain a stable source of income, and her failure to prevent contact between the child and the abusive boyfriend. *Id.* at 594.

On appeal, the mother claimed the ADA required "the state to make reasonable accommodations and provide services to assist a person with mental retardation to exercise their constitutionally protected rights." *Id.* at 595. Citing to *In re Terry*, 240 Mich.App. 14, 610 N.W.2d 563, 569 (2000), the court noted that while " 'mental retardation is a "disability" within the meaning of the ADA ... [s]everal courts have concluded that termination proceedings are not "services, programs or activities" under the ADA, and the ADA does not apply in termination proceedings as a defense to the termination of parental rights.' " *Id.* The *C.M.S.* court agreed with *Terry*, finding that if the state has made "reasonable efforts" to correct the conditions that initiated the state's involvement, the state properly satisfies the ADA's requirement for reasonably accommodating disabilities. *Id.*

Similar to North Carolina, our legislature requires the family court to issue a finding of whether DSS has made reasonable efforts to prevent removal of the child from his or her home and whether the child's continuation in the home

Rehabilitation Act, cases decided under that law are typically given substantial weight by federal courts when interpreting similar provisions of the ADA.").

would be contrary to the child's welfare. S.C.Code Ann. § 20–7–736(I) (Supp.2006).

In the case at hand, the family court made such a finding. First, DSS's numerous attempts to rehabilitate Mother, by way of counseling and therapy, indicate it made reasonable efforts to prevent Daughter's removal. Further, the counseling services provided to Mother were adapted to Mother's mental abilities. Mother's failure to schedule appointments, even though Mother demonstrated the capacity to schedule appointments in the past, was not a failure on the part of DSS.

As in *Humphreys* and *C.M.S.*, TPR was granted for several reasons, including Mother's diagnosable condition. Mother has an IQ of 73, and her intellectual skills are within mentally deficient and borderline limits. In addition to Mother's mental limitations, Mother has a dependent personality disorder, which is unlikely to change.

Thus, DSS provided reasonable services to Mother; however, Mother's diagnosable conditions subsisted, at least in part due to her own actions. If a parent suffers from a diagnosable condition, the family court may pursue TPR. Although these conditions may in fact be disabilities, the existence of the ADA does not prevent TPR when it is in the child's best interest and DSS makes reasonable efforts to remedy any conditions leading to the child's removal. *See* § 20–7–1572(6); *Baby Boy Roe*, 353 S.C. at 579, 578 S.E.2d at 735.

## V. Local Limitations of Services

Mother argues Sumter County's limitation of available services is not an excuse for DSS's failure to provide specialized services for Mother. We disagree.

As previously stated, Mother was referred to other organizations for their services, Mother received counseling adjusted to her mental level, and Mother received parenting classes in an attempt to help Mother provide acceptable care to her children. Therefore, DSS met its duty to provide specialized services to Mother.

## CONCLUSION

Accordingly, the family court's decision is **AFFIRMED.**[3]

STILWELL and SHORT, JJ., concur.

---

**3.** We decide this case without oral argument pursuant to Rule 215, SCACR.