# COURT OF APPEALS OF VIRGINIA

Present: Judges Huff, Raphael and Lorish
Argued at Arlington, Virginia


FRANK DEVON HARRIS

                                                    MEMORANDUM OPINION[*] BY
v.        Record No. 1126-21-4                      JUDGE GLEN A. HUFF
                                                    NOVEMBER 1, 2022
COMMONWEALTH OF VIRGINIA


FROM THE CIRCUIT COURT OF PRINCE WILLIAM COUNTY
Angela L. Horan, Judge

Meghan Shapiro, Senior Assistant Public Defender (Virginia
Indigent Defense Commission, on briefs), for appellant.

Lindsay M. Brooker, Assistant Attorney General (Jason S. Miyares,
Attorney General, on brief), for appellee.


Frank Devon Harris ("appellant") appeals the trial court's judgment revoking his

previously suspended sentences and imposing a sentence of nine years and twelve months'

incarceration. He assigns the following as error:

> The trial court erred by imposing ten years of active incarceration
> on Mr. Harris, and denying his motion to reconsider, where he
> stipulated to committing a new misdemeanor and violating a single
> technical condition of his probation, and his mitigation included
> profound developmental disabilities.

Appellant argues that the trial court abused its discretion by (1) finding that he violated

conditions he asserts were impossible for him to meet; (2) not considering reasonable

alternatives to incarceration; (3) improperly weighing the relevant factors; and (4) finding that

probation could not provide appropriate disability accommodations for him. This Court disagrees

and affirms the trial court's judgment.

---

[*] Pursuant to Code § 17.1-413, this opinion is not designated for publication.

BACKGROUND

"In revocation appeals, the trial court's 'findings of fact and judgment will not be reversed unless there is a clear showing of abuse of discretion.'" *Jacobs v. Commonwealth*, 61 Va. App. 529, 535 (2013) (quoting *Davis v. Commonwealth*, 12 Va. App. 81, 86 (1991)). "The evidence is considered in the light most favorable to the Commonwealth, as the prevailing party below." *Id.*

In 2011, appellant was convicted of attempted forcible sodomy and abduction, and he sentenced to ten years' incarceration with five years and six months suspended for each of the two counts. The trial court also imposed an indefinite period of supervised probation to follow his release from prison.

Appellant served his sentences and began supervised probation on April 4, 2019. Although he planned to live with his aunt in Maryland, her apartment complex did not allow sex offenders, which left appellant homeless. Probation placed appellant in a hotel for one week and "provided him with food gift cards, bus tokens, and coordinated services with the Community Services Board [("CSB")] to ensure his history of mental health disorders were quickly addressed."

Appellant did not adjust well to probation. In May 2019, probation officer Cheryl Scott reported that appellant "made it clear to probation he did not want or need mental health or substance abuse treatment," failed to attend a CSB appointment, violated global positioning system ("GPS") monitoring requirements, failed to obtain employment, and acted "verbally abusive and uncooperative." The trial court found appellant in violation of his probation conditions but did not revoke any of his previously suspended sentences, instead opting to continue him on probation.

In January 2020, probation officer Keith Brown alleged that appellant was late to two office visits, "[h]is explosive behavior" toward staff at the winter shelter led to his repeated

banning from the shelter, he had used social media "to interact and groom unsuspecting women," he had accessed dating sites, "various casual sex and escorts sites," and pornography sites involving teens that had "themes of aggression and pain," and he had dated a woman for approximately one month without informing her of his sexual-offending behavior. Brown and appellant discussed a treatment plan for appellant's mental health concerns, and probation again provided appellant with a hotel room for several weeks, as well as bus tokens, food gift cards, and a CSB treatment plan that included an evaluation for community treatment and Adult Developmental Disability Services. The trial court revoked appellant's suspended sentence for forcible sodomy and resuspended all but one year of that sentence. The trial court took no action on his abduction sentence.

Appellant returned to supervised probation in December 2020. In February 2021, probation officer Ian Kjera filed a major violation report ("MVR") alleging that appellant obtained his old smartphone within hours of being released despite being prohibited from using a smartphone without monitoring software and used that phone to access Facebook, contact a female friend, and access pornography. Appellant told Kjera that "he 'might' go commit a crime" if not allowed to possess the phone. At Kjera's request, appellant placed the phone in a trash can, but he later retrieved it when Kjera looked away. Moreover, appellant possessed another phone in February 2021, lied that it belonged to a friend, and refused to discard it. Finally, appellant was charged with shoplifting in December 2020 and convicted in May 2021 of an amended charge of trespassing after being forbidden to do so, a Class 1 misdemeanor. *See* Code § 18.2-119.

Kjera described appellant's attitude as "poor" and "confrontational," reported that he "made repeated statements of his desire to go back to jail where he was treated better than in the community," and "was clear that he would go back to jail and violate his conditions again after

- 3 -

he got out, [thus] continuing the cycle until he died." Kjera developed a case plan and gave appellant a paper copy, which appellant threw in the trash before leaving the probation building.

Kjera alleged that appellant violated Condition 1—requiring that he obey all laws—and Condition 6—requiring that he follow probation's instructions and be truthful and cooperative. Specifically, Kjera alleged that appellant violated Condition 6 by violating special instructions applicable to sex offenders requiring that he refrain from using social networking, accessing the internet without probation's permission, and possessing sexually explicit materials.

In an addendum to the MVR, Kjera asserted that appellant was removed from a homeless shelter after fighting with another resident, was subsequently removed from a hotel for threatening the hotel manager, had stopped taking mental health medication he had been prescribed in December 2020, and had not attempted to use employment or residential services at the shelter. In a second MVR addendum, Kjera reported that appellant continued to access the internet using a phone and had verbally abused the senior probation officer. Kjera opined that appellant's "assumption that the duties of probation include a requirement to meet his basic needs and secure housing for him [is] problematic in that he appears to take no accountability in seeking available services himself." The trial court issued a capias in March 2021.

At the August 2021 revocation hearing, appellant stipulated to the violations alleged in the February MVR and subsequent addenda. Neither side presented evidence. Appellant's argument focused on the importance of a phone in applying for jobs and securing CSB services, especially because he was prohibited from using the library due to his underlying offense. Appellant admitted he "was not the best probationer" but argued that he "struggles to understand concepts and has to be explained and spoon fed in many ways" due to low level intellectual functioning. Finally, he proffered that he had been appointed as a quarantine trustee at the jail.

His counsel conceded, "I don't think probation is proper anymore," and asked the court to consider a time-served sentence or a sentence near the low end of the sentencing guidelines.

Noting that appellant had appeared for probation violations three times in two years, the trial court explained that it was troubled by his "abusive and confrontational" behavior toward his probation officer, his failure to take his medication, and the fact that he threw away his probation plan. The trial court agreed that appellant "really need[ed] probation behind [him] to get reconnected" with society but found that appellant had refused to cooperate with probation. The court concluded, "I don't think probation is going to work out for you. I just don't think that's going to work. And when it can't work, the only thing I have to fall back on is a sentence that was just in the first place." The court accordingly reimposed the remaining nine years and twelve months of appellant's suspended sentences and terminated probation.

Appellant subsequently moved for reconsideration of his sentence, providing the trial court with further details about his intellectual difficulties. Specifically, appellant noted that he was born with fetal alcohol syndrome to a fourteen-year-old, homeless, single mother, had an IQ of 66, and was diagnosed with attention deficit hyperactive disorder, intermittent explosive disorder, mood disorder with psychotic features and hallucinations, bipolar disorder, Asperger's syndrome, organic brain syndrome, tic disorder, and several speech impediments. In his motion, appellant argued these disorders made it "incredibly difficult for him to be successful on probation." Although it was somewhat unclear, appellant's motion appeared to suggest that it was still appropriate for the trial court to terminate his probation but that it should not have reimposed his entire suspended sentences.

The trial court held a hearing on the reconsideration motion on October 15, 2021. Appellant offered testimony from an attorney, Melissa Heifetz, with a group identified as Advocacy Partners, LLC. Additionally, a letter from Ms. Heifetz was received as an exhibit.

Heifetz was presented as an advocate for people with developmental disabilities and an expert "to provide insight on how those with significant disabilities and mental health issues are interacting with government bodies, such as probation, and their reintegration into the community." Although Heifetz admitted she was not a psychologist and had never interviewed appellant or met with any of the probation officers, she nevertheless asked the trial court "to consider an alternative plan," under which appellant could receive "the therapeutic treatment and support that his disabilities require[d]." Heifetz testified that she had reviewed the underlying records, including appellant's psychosexual evaluation and presentence report, and opined that he "would require appropriate accommodations and modifications to his probation plan and orders in order to understand it, to comprehend it, and to be able to follow through on it."

More specifically, Heifetz testified that appellant needed a specialist in fetal alcohol syndrome to teach him "with multi-sensory type of instructions" and that "[h]e's going to need things repeated. He's going to need prompting every step of the way. He may need things like extra time, written instructions, calendars, timers." She further opined that any probation officers working with appellant "need to be trained or need to educate themselves in the specifics of his disability and create a plan and a home that is individualized so that he has the supports, the accommodations and modifications" he needed to be successful on probation. Heifetz said that an organization such as her own could work with probation to devise a community-based plan for appellant. In addition to admitting that she had neither met nor spoken with appellant or any of his probation officers, she conceded that she was speculating about probation's efforts to assist appellant, did not know what accommodations were made, and did not know how often the probation officers explained the conditions to appellant.

Appellant's counsel proffered that he was taking steps with probation to develop a housing plan for appellant and that appellant could not possibly succeed on probation without

accommodation for his disabilities. He asked the trial court to consider a sentence at the low end of the guidelines based on the mitigation evidence he presented.

In explaining its conclusions, the trial court initially observed that "the principles here are pretty clear. I only have incarceration or probation." The court told appellant, "As probation is currently structured, you're not able to do it. And that's what your attorney has spent all afternoon demonstrating to me." The court then remarked that it could not rely on probation to manage the risk he posed to the community and that incarceration was therefore necessary. Regarding potential disability accommodations, the court observed that it had not been presented with a plan but rather "some ideas and thoughts, which may lead to something. They may bear fruit. But at this point today, it has not been handed to me a plan forwarded by people who are accountable to the Court and the community." The court concluded that, without such a plan, it would not reconsider or change its prior order. The court invited appellant to file another reconsideration motion if he developed an appropriate plan while the case remained within the court's jurisdiction. The trial court entered its final order on the same day.

This appeal followed.

ANALYSIS

Appellant argues that the trial court abused its discretion by sentencing him to nine years and twelve months' incarceration. After suspending a sentence, a trial court "may revoke the suspension of sentence for any cause the court deems sufficient that occurred at any time within the probation period, or within the period of suspension fixed by the court." Code § 19.2-306(A). Moreover, under the revocation statute in effect when this revocation proceeding began, once the trial court found that appellant had violated the terms of suspension, it was obligated to revoke the suspended sentences and impose the original sentences, subject to any

suspension and terms that the trial court, in its discretion, deemed to be appropriate.  Code § 19.2-306(C)(ii) (Cum. Supp. 2020).[1]

I.

Appellant first contends the trial court abused its discretion by punishing him for violating conditions that were impossible for him to meet due to his intellectual disabilities.  He relies heavily on this Court's decision in *Word v. Commonwealth*, 41 Va. App. 496 (2003).  In *Word*, the circuit court conditioned the defendant's suspended sentence upon completion of a specific detention center program, which later refused to admit him on grounds of ineligibility. *Id.* at 498-99.  Finding that it was impossible for the defendant to comply with the condition, the circuit court revoked his suspended sentence and imposed a new period of incarceration.  *Id.* at 501.  This Court held on appeal that to the extent the trial court had found the defendant in willful violation of probation for not meeting a condition that was impossible for him to accomplish, the trial court had abused its discretion.  *Id.* at 499.

Appellant analogizes his failure to cooperate with probation with the defendant's ineligibility for a court-ordered program in *Word*.  Under the ruling in *Word*, when a defendant fails to fulfill an impossible condition, the trial court may not find that the defendant has willfully violated probation.

---

[1] Although Code § 19.2-306(C) was amended effective July 1, 2021, appellant does not argue that the statutory amendment applied in this case.  This Court recently held that it did not apply when, as here, the probation violations occurred and the revocation proceeding began before the effective date of the amendment. *See Green v. Commonwealth*, 75 Va. App. 69, 83-84 & n.4 (2022).  And even under the new statutory framework the trial court has discretion to impose the balance of a previously suspended sentence when a probationer commits a new criminal offense during the suspension period. *See* 2021 Va. Acts Sp. Sess. I, ch. 538; Code § 19.2-306.1(B).  Appellant was convicted of a misdemeanor offense in May 2021 that he committed in December 2020.

But appellant failed to prove that it was impossible for him to comply with the conditions to which he was subject.[2] The cases on which he relies involve specific conditions that defendants were unable to fulfill for discrete reasons. *See, e.g.*, *Peyton v. Commonwealth*, 268 Va. 503, 506-07 (2004) (involving a defendant unable to complete detention center program because he experienced an unforeseen medical emergency and was hospitalized during the period in which he was to complete the program); *Word*, 41 Va. App. at 498-99 (involving a defendant unable to complete program for which he was ineligible); *Duff v. Commonwealth*, 16 Va. App. 293, 298-99 (1993) (involving a defendant unable to pay restitution due to lack of funds). By contrast, appellant has failed to specify what conditions of his probation were "impossible" for him to meet. In fact, appellant suggested it *might be* possible for him to comply with his probation conditions—but offered no evidence to support the suggestion. Moreover, the trial court found that appellant had not met even the basic obligations of probation because he was "abusive and confrontational" with the probation officers, had not adhered to his medication regime, and discarded his probation plan. The trial court therefore did not abuse its discretion in revoking appellant's suspended sentences.

## II.

Appellant next argues that the trial court abused its discretion by not considering the reasonable alternative to prison: that probation should "provide disability-appropriate

---

[2] For example, appellant does not specify why it was impossible for him to comply with the phone use limitation. He falsely denied possessing and using a cell phone and retrieved a phone out of the trash can after his probation officer made him throw it away, demonstrating an understanding of, and willful defiance to, the probation officer's instructions.

accommodations to [appellant] in the future, perhaps by funding a qualified, outside organization to modify and support their supervision plan."[3]

Assuming without deciding that the trial court was required to consider reasonable alternatives to imprisonment, the record shows that the trial court considered the possibility of disability accommodations but found that appellant had not provided specific needs that differed from what probation had already tried. Many of Heifetz's recommendations were generalized and vague, such as remarking that appellant might require "hand-holding." More importantly, appellant made no attempt to differentiate Heifetz's recommendations from what probation had already done. For example, although Heifetz stressed the importance of multi-sensory type instructions, she admitted that she did not know whether probation was already providing such instructions. The MVRs detail probation's numerous attempts to explain instructions to appellant, but Heifetz admitted she did not know the frequency or manner of those communications, so it is not clear what other methods would have been more successful. Further, appellant did not follow-up on the trial court's invitation to file an additional motion to reconsider once he had more details. Accordingly, the trial court did not abuse its discretion.

---

[3] Although appellant elicited testimony from Heifetz regarding special accommodations, he did not ask the trial court to continue him on probation with the addition of such accommodations. Rather, he asked the trial court to consider a sentence at the low end of the guidelines based on the "significant mitigating circumstances" he presented. Appellant's disability-accommodation arguments before the trial court addressed a different issue than the arguments he presents on appeal. That is, he argued below that probation should have accommodated him and that the trial court should therefore not punish him so harshly; whereas he now argues that the trial court should have continued him on probation with accommodations. *See Bethea v. Commonwealth*, 297 Va. 730, 743 (2019) ("[T]he argument asserted on appeal [must] be the same as the contemporaneous argument at trial."). Still, this Court assumes without deciding that appellant preserved this argument for appeal.

III.

Appellant next asserts that the trial court abused its discretion by improperly weighing the possible benefits of disability accommodations against his poor performance without accommodations. A trial court abuses its discretion when it fails to consider a relevant factor that should have been given significant weight, gives significant weight to an irrelevant or improper factor, or "commits a clear error of judgment." *Marinaro v. Marinaro*, 73 Va. App. 424, 430-31 (2021) (quoting *Barrow v. Commonwealth*, 73 Va. App. 149, 153 (2021)).

Weighing any mitigating factors presented by a defendant falls within the trial court's purview. *Keselica v. Commonwealth*, 34 Va. App. 31, 36 (2000). This Court will not disturb the trial court's judgment based on its assessment of appellant's mitigating disability accommodations evidence.[4] Moreover, appellant's repeated probation violations were a relevant factor for the trial court to consider. Accordingly, his argument on this basis likewise fails.

IV.

Finally, appellant argues that the trial court abused its discretion by finding that probation was incapable of providing disability accommodations. This argument misstates the record. The trial court did not find that probation was incapable of providing disability accommodations;

---

[4] To support his argument that the trial court improperly weighed the possibility of probation accommodations, appellant points to the federal Americans with Disabilities Act ("ADA") and its requirement that State and local governments provide equal access to their programs and services to disabled persons. *See generally* 42 U.S.C. §§ 12131-33. This Court explained previously in *Wilson v. Commonwealth*, 31 Va. App. 200, 204 (1999) (citing 42 U.S.C. § 12133's "specific civil and administrative remedies" for enforcing the ADA), that "a probation revocation hearing in a criminal court is not the proper forum in which to attack [an ADA] violation." Appellant acknowledges *Wilson*'s holding and does not challenge it. Moreover, the ADA requirements, if any, were not part of appellant's assignments of error.

While revocation proceedings are not an appropriate mechanism for enforcing ADA compliance, the holding in *Wilson* does not necessarily preclude application of ADA standards to Virginia's probation revocation proceedings where a party has satisfied the threshold proof of being a qualified individual under the ADA entitled to reasonable accommodation.

rather, the trial court found that continuing probation, even with some yet-to-be-specified accommodations, would not mitigate the risk appellant posed to the community. The court did not abuse its discretion in this determination either.

CONCLUSION

For the foregoing reasons, this Court affirms the trial court's judgment.

*Affirmed.*

Raphael, J., concurring.

I join the majority opinion. I agree that the assignment of error here does not encompass whether the trial court's revocation of Frank Harris's suspended sentence complies with the requirements of the Americans with Disabilities Act of 1990 (ADA), Pub. L. No. 101-336, 104 Stat. 327 (codified as amended at 42 U.S.C. §§ 12101 to 12213). I also agree that this Court's decision in *Wilson v. Commonwealth*, 31 Va. App. 200 (1999), "does not necessarily preclude application of ADA standards to Virginia's probation revocation proceedings where a party has satisfied the threshold proof of being a qualified individual under the ADA entitled to reasonable accommodation." *See supra* note 4 and *infra* Part III.

Because the law in this area is complicated and evolving, I write separately to identify the issues that should be addressed in an appropriate case to determine whether and how the ADA applies to a trial court's decision to revoke an offender's probation or suspended sentence based on conduct attributable to the offender's asserted disability. Parts I and II provide background on the ADA and describe how courts have addressed whether and how it applies in State judicial proceedings. Part III identifies at least some of the questions that may need to be addressed in a future revocation proceeding when an offender claims that the terms of a suspended sentence or probation violated the ADA by failing to reasonably accommodate the offender's disability.

I.

The ADA's stated purpose is "to provide a clear and comprehensive national mandate for the elimination of discrimination against individuals with disabilities." 42 U.S.C. § 12101(b)(1). Title I prohibits disability discrimination in employment. *See* 42 U.S.C. § 12112(a). Title II prohibits disability discrimination in the provision of public services. Section 12132 provides that "no qualified individual with a disability shall, by reason of such disability, be excluded

from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity." 42 U.S.C. § 12132.[5]

Section 504 of the Rehabilitation Act of 1973, Pub. L. No. 93-112, tit. V, § 504, 87 Stat. 355, 394 (codified as amended at 29 U.S.C. § 794(a)), already prohibited disability discrimination, but its protection applied only to programs or activities "receiving Federal financial assistance." 29 U.S.C. § 794(a). The ADA extended that non-discrimination mandate "to all programs, activities, and services provided or made available by state and local governments." H.R. Rep. No. 101-485, pt. 2, at 84 (1990); *see also* 42 U.S.C. § 12201(a) (providing that the ADA should not be "construed to apply a lesser standard than the standards applied under title V of the Rehabilitation Act of 1973").[6]

A "public entity" subject to the ADA's nondiscrimination mandate includes "(A) any State or local government; [and] (B) any department, agency, special purpose district, or other instrumentality of a State or States or local government." 42 U.S.C. § 12131(1). Every such public entity must "make reasonable modifications in policies, practices, or procedures when the modifications are necessary to avoid discrimination on the basis of disability, unless the public entity can demonstrate that making the modifications would fundamentally alter the nature of the service, program, or activity," 28 C.F.R. § 35.130(b)(7)(i); *see also* 42 U.S.C. § 12201(f), or result in "undue financial and administrative burdens," 28 C.F.R. § 35.150(a)(3) (2021).

---

[5] In this context, a "qualified individual with a disability" is a person "with a disability who, with or without reasonable modifications to rules, policies, or practices . . . meets the essential eligibility requirements for the receipt of services or the participation in programs or activities provided by a public entity." 42 U.S.C. § 12131(2); *see also* 42 U.S.C. § 12102 (defining "disability").

[6] Congress grounded its authority to enact the ADA on its Article I power to regulate interstate commerce and on its enforcement powers under § 5 of the Fourteenth Amendment. *See* 42 U.S.C. § 12101(b)(4).

II.

Since the ADA's enactment, courts have struggled to determine the ADA's application to State judicial proceedings. Only a few cases have arisen in the context of probation-revocation proceedings involving offenders with disabilities. Many more have arisen in the context of proceedings to terminate parental rights. How courts in termination-of-parental-rights cases have addressed the ADA's application illuminates how the same question may be evaluated in the probation-revocation context.

A.

Many courts have held that the government's violation of the ADA cannot be asserted as a defense in a proceeding to terminate parental rights (TPR). Some of those courts have reasoned that a TPR proceeding is not among the "services, programs, or activities of a public entity" that are subject to the non-discrimination mandate in § 12132.[7] Some have concluded that the ADA does not apply in TPR proceedings because the proceedings are meant to benefit

[7] *See S.G. v. Barbour Cnty. Dep't of Hum. Res.*, 148 So. 3d 439, 447 (Ala. Civ. App. 2013) ("Consistent with the majority of courts that have considered ADA challenges to termination-of-parental-rights proceedings, we hold that a termination-of-parental-rights proceeding is not a service, program, or activity within the meaning of the ADA and that, therefore, the ADA does not apply to such a proceeding."); *In re Elijah C.*, 165 A.3d 1149, 1164-65 (Conn. 2017) (same); *In re Jeanette L.*, 69 N.E.3d 918, 922 (Ill. App. Ct. 2017) (same); *In re Adoption of Gregory*, 747 N.E.2d 120, 125 (Mass. 2001) (same); *In re Terry*, 610 N.W.2d 563, 570 (Mich. Ct. App. 2000); *In re Custody of La'Asia S.*, 739 N.Y.S.2d 898, 908-09 (N.Y. Fam. Ct. 2002) (same); *In re A.P.*, 868 S.E.2d 692, 703 (N.C. Ct. App. 2022) (same); *In re Kayla N.*, 900 A.2d 1202, 1208 (R.I. 2006) (same); *In re B.S.*, 693 A.2d 716, 720 (Vt. 1997) (same); *In re Dependency of C.P.*, Nos. 47236-4-I, 47237-2-I, 47238-1-I, 2002 WL 49922, at *7 (Wash. Ct. App. Jan. 14, 2002) (same).

the child, not the parent.[8]  Some have concluded that an ADA claim cannot be litigated in a TPR

proceeding because the ADA authorizes a *civil* suit by the disabled claimant, suggesting, by

negative implication, that an affirmative defense is unavailable in a TPR proceeding.[9]  Some

courts have cited *both* rationales: that TPR proceedings are not "services, programs, or activities"

under title II of the ADA *and* that the existence of a federal cause of action under the ADA does

not give rise to a defense in a State-court proceeding.[10]

Several courts, by contrast, have concluded that the ADA applies in TPR proceedings.[11]

As the Court of Appeals for the District of Columbia put it:

---

[8] *See M.C. v. Dep't of Child. & Fams.*, 750 So. 2d 705, 706 (Fla. Dist. Ct. App. 2000); *Stone v. Daviess Cnty. Div. of Child. & Fam. Servs.*, 656 N.E.2d 824, 830-31 (Ind. Ct. App. 1995); *Gregory*, 747 N.E.2d at 125 (Mass.); *In re D.A.B.*, 570 S.W.3d 606, 621 n.15 (Mo. Ct. App. 2019); *N.J. Div. of Youth & Fam. Servs. v. Att'y Gen.*, 782 A.2d 458, 473 (N.J. Super. Ct. App. Div. 2001); *In re J.J.L.*, 150 A.3d 475, 482 (Pa. Super. Ct. 2016); *Kayla N.*, 900 A.2d at 1208 (R.I.); *In re S.G.S.*, 130 S.W.3d 223, 230 (Tex. App. 2004).

[9] *E.g.*, *J.T. v. Ark. Dep't of Hum. Servs.*, 947 S.W.2d 761, 768 (Ark. 1997) ("[E]ven if DHS had failed to make reasonable accommodations for Appellant's disability, such failure would not negate the trial court's decision to terminate Appellant's parental rights."); *In re M.S.*, 95 Cal. Rptr. 3d 273 (Cal. Ct. App. 2009) ("[T]he ADA does not directly apply to juvenile dependency proceedings and cannot be used as a defense in them . . . .  [A]ny challenge a parent has under the ADA for alleged violations must be raised in a separate cause of action in federal court." (alteration in original) (quoting *In re Diamond H.*, 98 Cal. Rptr. 2d 715, 722 (Cal. Ct. App. 2000))); *People ex rel. T.B.*, 12 P.3d 1221, 1223 (Colo. App. 2000) (same reasoning); *In re Doe*, 60 P.3d 285, 291 (Haw. 2002) (same); *In re B.K.F.*, 704 So. 2d 314, 317-18 (La. Ct. App. 1998) (same); *In re E.T.C.*, 141 S.W.3d 39, 48 (Mo. Ct. App. 2004) (same); *In re Torrance P.*, 522 N.W.2d 243, 246 (Wis. 1994) (same).

[10] *See In re Anthony P.*, 101 Cal. Rptr. 2d 423, 425-26 (Cal. Ct. App. 2000); *In re Antony B.*, 735 A.2d 893, 899 (Conn. App. Ct. 1999); *In re Johnson*, No. 2070, 2017 WL 6617213, at *5-6 (Md. Ct. Spec. App. Dec. 28, 2017); *In re B.A.*, 73 N.E.3d 1156, 1159 (Ohio Ct. App. 2016); *see also In re J.B.K.*, 95 P.3d 699, 702-03 (Mont. 2004) (citing both rationales without resolving ADA's application to TPR proceedings).

[11] *See In re S.K.*, 440 P.3d 1240, 1250 (Colo. App. 2019) ("[W]hen a parent involved in a dependency and neglect proceeding has a disability under the ADA, the Department and the juvenile court must account for and, if possible, make reasonable accommodations for the

> Courts . . . must modify their policies, practices and procedures to the extent reasonably necessary to avoid discriminating against disabled parents in permanency and other proceedings, for example by providing assistance to enable such parents to participate fully in the proceedings, and by exercising discretion—where authorized and consistent with the best interests of the children involved in the proceedings—to allow more time to permit disabled parents, with appropriate supportive services, to achieve goals for reunification.

*In re H.C.*, 187 A.3d 1254, 1266 (D.C. 2018). Some courts have taken a hybrid approach, holding that the ADA applies to State social-service agencies supervising parental reunification services, even though a failure to provide reasonable accommodations to disabled parents might not be a defense in a TPR proceeding itself.[12] Still other courts have sidestepped the question by concluding that State reunification services already provided reasonable accommodations that were required (or might otherwise be required) by the ADA.[13]

It bears mention that those courts holding that TPR proceedings are not "services, programs, or activities of a public entity" under § 12132 have generally failed to address contrary guidance from the Department of Justice (DOJ). DOJ stated in its 1991 preamble to the

---

parent's disability when devising a treatment plan and providing rehabilitative services to the parent. And in deciding whether to terminate parental rights . . . , a juvenile court should consider whether reasonable accommodations were made for the parent's disability in determining whether the parent's treatment plan was appropriate and reasonable efforts were made to rehabilitate the parent."); *In re H.C.*, 187 A.3d 1254, 1266 (D.C. 2018); *State ex rel. K.C. v. State*, 362 P.3d 1248, 1251-53 (Utah 2015).

[12] *See Antony B.*, 735 A.2d at 899 n.9 (Conn. App. Ct.); *Terry*, 610 N.W.2d at 570 (Mich. Ct. App.); *D.A.B.*, 570 S.W.3d at 621 n.15 (Mo. Ct. App.); *State ex rel. Child., Youth & Fams. Dep't v. Geneva C.*, No. A-1-CA-39557, 2022 WL 3974081, at *5 (N.M. Ct. App. Aug. 31, 2022).

[13] *See Lucy J. v. Dep't of Health & Soc. Servs.*, 244 P.3d 1099, 1116 (Alaska 2010); *Jessica P. v. Dep't of Child Safety*, 484 P.3d 148, 152-53 (Ariz. Ct. App. 2021); *In re C.M.*, 526 N.W.2d 562, 566 (Iowa Ct. App. 1994); *Matter of K.L.N.*, 482 P.3d 650, 658-60 (Mont. 2021); *S.C. Dep't of Soc. Servs. v. Mother ex rel. Minor Child*, 651 S.E.2d 622, 627-28 (S.C. Ct. App. 2007).

implementing regulations[14] "that title II [of the ADA] applies to *anything* a public entity does. Title II coverage . . . is not limited to 'Executive' agencies, but includes activities of the legislative and *judicial* branches of State and local governments. *All* governmental activities of public entities are covered . . . ." 28 C.F.R. pt. 35 app. B, at 690 (2021) (emphasis added); *see also* 28 C.F.R. § 35.190(b)(6) (2021) (stating that DOJ is tasked with providing ADA guidance regarding "the administration of justice, including *courts* and correctional institutions" (emphasis added)). The preamble did not specifically address TPR or probation-revocation proceedings. According to guidance issued by DOJ in 2015, however, "State court proceedings, such as termination of parental rights proceedings, are state activities and services for purposes of Title II."[15] DOJ said that, "[l]ike child welfare agencies, [State] courts must also make reasonable modifications to policies, practices, and procedures where necessary to avoid discrimination on the basis of disability."[16]

In addition, cases holding that the ADA provides only a civil remedy, not a defense in a TPR proceeding, may have overlooked that States are obligated to obey a federal statute that is not otherwise unconstitutional. Under the Supremacy Clause, U.S. Const. art. VI, cl. 2, no State has a "right to disregard the Constitution or valid federal law. The States and their officers are bound by obligations imposed by the Constitution and by federal statutes that comport with the constitutional design." *Alden v. Maine*, 527 U.S. 706, 755 (1999). Thus, the fact that the ADA

---

[14] Congress directed DOJ to promulgate regulations to implement the requirements of title II. *See* 42 U.S.C. § 12134.

[15] United States Department of Justice and Department of Health and Human Services, *Protecting the Rights of Parents and Prospective Parents with Disabilities: Technical Assistance for State and Local Child Welfare Agencies and Courts under Title II of the Americans with Disabilities Act and Section 504 of the Rehabilitation Act* 9 (Aug. 2015), https://www.ada.gov/doj_hhs_ta/child_welfare_ta.pdf.

[16] *Id.*

creates a private right of action, 42 U.S.C. § 12133, and abrogates State immunity from suit, *id.* § 12202, does not necessarily free a State to ignore the nondiscrimination requirements of title II until the State is successfully enjoined in a civil suit.

In short, whether and how the ADA applies in TPR proceedings remains unsettled.

B.

Although fewer decisions have addressed whether the ADA applies in probation-revocation settings, these cases involve questions similar to the TPR context. The Supreme Court of the United States held in 1998 that § 12132 of the ADA "unmistakably includes State prisons and prisoners within its coverage." *Pa. Dep't of Corr. v. Yeskey*, 524 U.S. 206, 209 (1998).[17] The Court in *Yeskey* ruled that a prisoner who brought a civil suit stated a valid ADA claim against Pennsylvania's department of corrections when he alleged that he was improperly excluded based on his disability (hypertension) from participating in a motivational "boot camp" program that "would have led to his release on parole in just six months." *Id.* at 208, 213.

Because *Yeskey* involved a civil suit under the ADA, however, the decision did not address whether the ADA applies to criminal-sentencing and probation-revocation decisions. The few cases to address that question echo cases addressing the same question in the TPR context. One court said, for instance, that a criminal proceeding is not a "service, program, or activity" covered by the ADA.[18] A couple have concluded that the ADA provides only a civil

_____

[17] The Court did not reach "whether application of the ADA to state prisons is a constitutional exercise of Congress's power under either the Commerce Clause or § 5 of the Fourteenth Amendment." *Yeskey*, 524 U.S. at 212 (citations omitted). *But see United States v. Georgia*, 546 U.S. 151, 159 (2006) ("[I]nsofar as Title II creates a private cause of action for damages against the States for conduct that *actually* violates the Fourteenth Amendment, Title II validly abrogates state sovereign immunity.").

[18] *State v. Barclay*, No. 16-0699, 2017 WL 104952, at *3-4 (Iowa Ct. App. Jan. 11, 2017) (noting absence of "precedent from Iowa or other jurisdictions where a criminal defendant has relied on the ADA to successfully attack a sentencing court's exercise of discretion").

remedy, so that a disability-discrimination claim cannot be raised in a criminal-sentencing proceeding.[19]  By contrast, the Ninth Circuit has reasoned that "case law indicates that the ADA applies in contexts that involve substantive criminal law decisions." *Thompson v. Davis*, 295 F.3d 890, 897 (9th Cir. 2002).

For its part, DOJ issued guidance in 2017 stating, in the criminal-justice context, that public entities covered by title II include courts when "setting bail or conditions of release," when "sentencing," and when "determining whether to revoke probation."[20]

III.

As noted at the outset, I agree with the majority that this Court's 1999 decision in *Wilson* should not be read to negate the application of the ADA to probation-revocation proceedings. The Court there was unpersuaded by Wilson's argument that she was the victim of disability discrimination under the ADA when her probation was revoked after the community-based detention center in which she was ordered to enroll declared her ineligible for its "boot camp" program on account of her schizophrenia. *Wilson*, 31 Va. App. at 204.  Noting that the ADA "provides specific civil and administrative remedies," this Court could not discern a statutory intent "to provide rights that could be asserted in a criminal proceeding or at a probation revocation hearing." *Id.*  The Court then said, "Assuming, without deciding, that the *Detention Center* violated the ADA in rejecting Wilson, a probation revocation hearing in a criminal court is not the proper forum in which to attack that violation.  The *Detention Center* is not a party to this case." *Id.* (emphasis added).

---

[19] *State v. McCammon*, No. 105,765, 2012 WL 1920081, at *4 (Kan. Ct. App. May 18, 2012); *State v. Honka*, No. DA 15-0318, 2016 WL 5107040, at *2 (Mont. Sept. 20, 2016).

[20] United States Department of Justice, Civil Rights Division, *Examples and Resources to Support Criminal Justice Entities in Compliance with Title II of the Americans with Disabilities Act* (Jan. 2017), https://www.ada.gov/cjta.html.

*Wilson*'s focus on the need for the detention center itself to be a party blurs the precise scope and rationale of the ruling. The Court did not address, for instance, whether the trial court itself must comply with the anti-discrimination requirements of the ADA, either when sentencing an offender with a disability or when revoking probation or a suspended sentence because of the offender's disability-caused inability to satisfy the conditions of his release. The Court also did not address DOJ's regulatory guidance that the ADA applies to "[a]ll governmental activities of public entities," including the "judicial" branch of State government. 28 C.F.R. pt. 35 app. B, at 690.

*Wilson*, of course, was decided eighteen years before DOJ's 2017 guidance that the ADA applies to courts when sentencing offenders or revoking their probation. *See supra* note 20. Notably, the Commonwealth took the position at oral argument here that the ADA applies in criminal proceedings to revoke a suspended sentence. The Commonwealth maintained, however, that Harris failed to propose a reasonable accommodation and that Harris's ADA claims, in any case, were procedurally defaulted.

Although the procedural posture of this case precludes the Court from reaching the ADA questions, these questions are difficult and important. They include:

- whether the ADA applies in a criminal proceeding when a trial court imposes conditions on (or revokes) a suspended sentence or probation for an offender whose disability may prevent him from satisfying those conditions without reasonable accommodations;

- whether an offender who claims that the terms of probation or a suspended sentence do not reasonably accommodate his disability must raise that claim at

- 21 -

sentencing (when those terms are established), rather than for the first time in a

revocation proceeding;[21]

- whether the offender or the Commonwealth bears the burden of identifying a

  reasonable accommodation, or whether that burden is shared;[22] and

- whether special considerations apply when evaluating ADA claims in the

  criminal-sentencing context.[23]

---

[21] Similar issues have been litigated in the TPR context. *Compare K.C.*, 362 P.3d at 1253 (Utah) (permitting parent to claim that reunification plan failed to accommodate the parent's disability in opposition to the State's petition to terminate parental rights), *with Gregory*, 747 N.E.2d at 127 (Mass.) ("[W]here, as here, a disabled parent fails to make a timely claim that the department is providing inadequate services for his needs, he may not raise noncompliance with the ADA or other antidiscrimination laws for the first time at a termination proceeding.").

[22] *Compare Duvall v. County of Kitsap*, 260 F.3d 1124, 1139 (9th Cir. 2001) ("When the plaintiff has alerted the public entity to his need for accommodation (or where the need for accommodation is obvious, or required by statute or regulation), the public entity is on notice that an accommodation is required . . . . A public entity[] . . . is [then] required to undertake a fact-specific investigation to determine what constitutes a reasonable accommodation . . . ."), *with Wright v. N.Y. State Dep't of Corr.*, 831 F.3d 64, 76 (2d Cir. 2016) (stating that the inmate "'bears the initial burdens of both production and persuasion as to the existence of an accommodation' that is 'facial[ly] reasonable[ ].' The burden of persuasion then shifts to the defendant to 'rebut the reasonableness of the proposed accommodation.' 'This burden of non-persuasion is in essence equivalent to the "burden of showing, as an affirmative defense, that the proposed accommodation would cause [the defendant] to suffer an undue hardship."'" (alterations in original) (citations omitted) (quoting *Dean v. Univ. at Buffalo Sch. of Med. & Biomedical Scis.*, 804 F.3d 178, 190 (2d Cir. 2015))).

Similar questions have divided courts in the TPR context. *Compare S.K.*, 440 P.3d at 1248 (Colo. App.) ("The parent is responsible for disclosing to the Department and the juvenile court information regarding his or her mental impairment or other disability. And the parent should also identify any modifications that he or she believes are necessary to accommodate the disability."), *and Gregory*, 747 N.E.2d at 127 (Mass.) ("[A] parent must raise a claim of inadequate services in a timely manner so that reasonable accommodations may be made."), *with Geneva C.*, 2022 WL 3974081, at *6 (N.M. Ct. App.) (holding that the burden to define the necessary accommodations "is shared," calling for collaboration between the parents, the agency, and the court).

[23] *Cf. O'Lone v. Estate of Shabazz*, 482 U.S. 342, 348 (1987) ("The limitations on the exercise of constitutional rights [by inmates] arise both from the fact of incarceration and from valid penological objectives—including deterrence of crime, rehabilitation of prisoners, and

"As a general rule, we serve as 'a court of review, not of first view.'" *Cal. Condo. Ass'n v. Peterson*, ___ Va. ___, ___ (Mar. 17, 2022) (quoting *Bailey v. Loudoun Cnty. Sheriff's Off.*, 288 Va. 159, 181 (2014)). Accordingly, the necessary facts must be developed—and the legal arguments presented first to the trial court—to enable these questions to be addressed on a complete record.

---

institutional security."); *Overton v. Bazzetta*, 539 U.S. 126, 132 (2003) ("We must accord substantial deference to the professional judgment of prison administrators, who bear a significant responsibility for defining the legitimate goals of a corrections system and for determining the most appropriate means to accomplish them.").